Gibson et al. *vs.* Conner.

No. 7.—BLANCHE G. GIBSON & ASEL P. ROOD, plaintiffs in error *vs.* HENRY W. CONNER, defendant in error.

[1.] A note in the hands of a holder for a valuable consideration, transferred before due, and without notice of any equities between the maker and the payee, *as collateral security for an existing debt*, is not liable to the equities between the maker and the payee.

Assumpsit upon Promissory Note.    Tried before Judge ALEXANDER.    In Stewart Superior Court.    April Term, 1847.

The note sued on was payable to Jernigan Lawrence & Co., or bearer, and had been transferred to the defendant in error, before due.

The plea alleged, that this note was first transferred by the payees to Stewart & Fountain, as *collateral security* only, and not as absolute property ; and afterwards was tranferred by Stewart & Fountain to the defendant in error, as *collateral security* only, and not as absolute property.   The first transfer, to secure Stewart & Fountain as creditors of the payees, and the transfer by them to the defendant in error, to secure certain of the creditors of John Fountain, or Stewart & Fountain.

The plea set up a defence in bar against the right of the payees to recover on the said note.

The defendant in error, who was plaintiff in the action below, demurred to the plea, it not being alleged that he took said note with notice, &c.   Whereupon, after argument, the Court below sustained the demurrer and dismissed the plea, and the plaintiffs in error excepted.

HOLT, for plaintiffs in error.

COOPER & JONES, BENNING & JONES, for the defendants in error, were stopped by the Court.

*By the Court.*—NISBET, J. delivering the opinion.

The record in this case discloses, that the plaintiff received the note declared on, as collateral security for existing liabilities. The suit was brought against the maker, who set up in defence certain equities between him and the payee.   The plea was demurred to, on the ground that it did not aver that the note was

transferred after maturity, or that the holder took it with notice of
the equity. The reply to the demurrer in argument was, that in-
asmuch as the plaintiff took the note as *collateral security* only, he
did not pay value for it in the regular course of trade, and there-
fore is subject to all the equities between the maker and the payee.
The Court below, Judge Alexander presiding, sustained the
demurrer and dismissed the plea. The bill of exceptions is
founded upon this decision.

[1.] I consider that the principle involved here, has been settled
by this Court in the case of *Bond* vs. *the Central Bank.* The
case there agrees with this in all the facts, except that the
note in that case, was transferred, not as *collateral security* for, but
*in extinguishment of*, a pre-existing debt. Whether this difference,
in that particular, makes a difference in the principle which shall
govern this case, and distinguishes it from that case, is per-
haps the only question left to me for discussion. I do not perceive
(and such is the judgment of this Court) that this case is, on prin-
ciple, distinguishable from the case already decided. We think,
that whether the plaintiff receives the note in payment of, or as
collateral security for, a pre-existing debt, he is not liable to the
equities between the original parties, unless he received it after
maturity, or with notice of those equities. Judge Lumpkin
concludes his review of the authorities in *Bond* vs. *The Central
Bank* as follows: "We have not the slightest difficulty, either
upon authority or principle, in ruling that the Central Bank,
receiving the note of Joseph Bond, payable to William F. Bond
or bearer, a month before its maturity, from Samuel Beall, in
satisfaction of the pre-existing debts of Beall to the Bank, upon
which there were solvent securities, took it free from any equities
which might have been set up between the maker and payee.
Any other view would destroy the value of negotiable paper;
no creditor would ever receive notes from his debtor, if in doing
so he incurred the peril proposed by this defence. Instead of
waiting with his debtor, by receiving collaterals, and thus strength-
ening the security of his claim, the gruffy demand in every case
would be, *pay me what thou owest*, and, in the event of failure,
the unfortunate debtor would be hauled instantly to the court
house and the prison. Public policy, no less than humanity,
stands opposed to such a conclusion." *Bond* vs. *the Central Bank,*
2 *Kelly,* 106. This reasoning, the Court, it will be seen, applies as
well to a case like the present, as to the case then being decided.

Adverting thus to what I consider as an adjudication of the question before me, I shall content myself with but a brief summary of the doctrines which grow out of the case made upon this record.· And first I state the following general rule :

If a negotiable paper is not unlawful, and void in its inception, he to whom it is transferred in due form, and who receives it in good faith, and for a valuable consideration, before it is due, without notice of any thing that would exonerate the maker or acceptor from paying it to the one from whom he receives it, can recover its amount from such maker or acceptor, although the party from whom he received it, could not. The authorities in support of this proposition are almost innumerable. Taken as a general proposition, there is no controversy about it. I refer only to a few of the earlier cases in England, and a few of the American cases : *Ld. Raym.* 738 ; 1 *Salk.* 126 ; 3 *id.* 71 ; 3 *Burrow*, 1516 ; 12 *Pick.* 545 ; 6 *Mass.* 428 ; 20 *Pick.* 545 ; 1 *Cow.* 387 ; 1 *S. & R.* 180 ; 2 *Johns.* 300 ; 5 *id.* 118 ; 1 *Hill, S. C.* 1 ; 16 *Peters*, 1 ; 5 *Johns. Ch. R.* 54. This is a doctrine which, Mr. Story says, " is laid up among the fundamentals of the law, and requires no authority or reasoning to be now brought in its support." It is also among the fundamentals laid up in the law, that he who takes a bill, although for a valuable consideration and *bona fide*, after it falls due, or with notice of any equitable defence which the maker may set up against the payee, will himself also be subject to that defence. In this case the plea does not charge that the note was transferred to the plaintiff after it fell due, or that the plaintiff had notice of the defence set up, when he received it. The pleadings in the case admit the transfer before maturity, and without notice of any equity in favour of the defendant. So that the question is this ; is the plaintiff a *bona fide* holder for value, in the sense of the rule first laid down ?

The language of that rule, in most of the earlier cases, is to the effect, that the holder must come into the possession of the paper *in the usual course of trade*, and for a valuable consideration. What is the *usual course of trade*, and what amounts to receiving a paper *in the usual course of trade ;* are questions which have been fully and ably discussed in the books. It is contended in this cause, that the plaintiff, Mr. Conner, who is a banker, and whose operations extend over the Carolinas and Georgia, having a debt due to him in Columbus, Georgia, which originated perhaps in a bank discount, having, with humane forbearance, received this note as

collateral security rather than sue his debtor at once, did not take it *in the usual course of trade.* The rule, without doubt, had its origin in the necesities of the commercial world; it is founded on that commercial policy which widens and deepens the channels of paper circulation; which gives to a bill of exchange or an indorsed promissory note, some of the attributes of money, credit, negoti ability, and an exchangeable value, all over the world. With such enlarged views of the origin and object of this rule, it is difficult to find a good reason for the strenuous efforts that have been made, both in England and America, to confine its operations to a limited range of cases; to cases, in which the holder has made in its purchase an actual advance in money or its equivalent, for the bill or note. This looks to me like restricting *trade* to the mere operation of buying and selling exchange, and directing its *course* along the exchange alleys of London, Amsterdam and New York; whilst it excludes the rule altogether from the wider, the almost illimitable fields of commerce. The usual *course* of trade, means, no doubt, the ordinary *operations* of trade. *Trade*, at different ages of the world, has been quite a different thing, and its usual operations very different. At one time the Jews conducted the trade of the world ; they were money-brokers, jobbers and petty dealers; and now the trade of Great Britain and of our Union girdles the world. The course of trade, at this day, is around the globe, and co-extensive with its surface. We cannot now apply this phraseology to any thing short of the operations of men in all their variety of character, who are engaged in business of any kind involving the use of credit. If the object of the protection which the rule affords, is to facilitate trade, by giving availableness to notes and bills as a circulating medium, I cannot see why it should not be extended to him who receives such paper in extinguishment of, or as security for, a pre-existing debt, as well as to him who buys a bill in the market for the purpose of transmitting funds from one point of the world to another. In the hands of the former, the bill or note derives its value from the circulating quality which it possesses, founded on the credit which is due to the names that are on it, as much as in the hands of the latter. The necessities of the former to use it, even in the limited sphere of a business, which might be termed personal or domestic, are as great as of the latter, whose operations embrace the wider range of foreign commerce. *According* to the doctrine which thus restricts this salutary rule, the village

Gibson et al. *vs.* Conner.

broker, who buys a bill of $500 to-day to sell again to-morrow at a fraction advance, is protected, whilst a merchant in New York, whose customer in Georgia, in failing circumstances, has turned over to him collateral securities for a debt of $50,000, is not protected. This does not look like promoting a sound mercantile policy. The great objection to this construction is, that it limits the use of negotiable paper. If it may not be safely used to pay or secure debts, then so far as there would be a demand for notes and bills for these purposes, upon the construction for which we contend, they are not negotiable. If creditors are to take the hazard of the equities between the maker and the transferor, they will not take paper at all in payment or as security. The consequence would be, that the notes in the hands of the debtor would be but as the evidence of a debt not negotiable. He could not use them. They are not available to sustain his credit. He is sued and distressed, and perhaps bankrupted, whilst, in turn, his debtors are driven into the same troubles, and the evil runs the course of an interminable circle. Multiplication of suits, bankruptcies, and suffering, are the legitimate fruits of the restricted application of the rule. Not the least of the evils which spring from it would be, the exclusion from commercial purposes of so much capital as is represented by negotiable paper, used in payment or as security whilst in circulation. It would prevent renewals, interfere with or prevent the running of accommodation bank paper, and thus limit the facility of loans, reduce the number of mercantile settlements, and arrest the progress of *trade*, or dealings between man and man in various ways.

Upon authority, in England and the United States, it is settled, that a note taken in payment of a pre-existing debt, before due and without notice of the maker's equity, can be enforced against him. He cannot set up an equitable defence, good as between him and the payee, against a holder taking under such circumstances. In New York it has been held differently, but the weight of authority there is decidedly against the defence. In *Swift* vs. *Tyson*, 16 *Peters*, 1, the Supreme Court determined against it. The opinion of Judge Story, in that case, reviews the whole doctrine, and traverses the whole field of authority. It may be safely referred to, as the ablest exposition of the subject in the American books. With confidence too, I again refer to the thorough review of the subject by Judge Lumpkin, in *Bond* vs. *the Central Bank*. The only question which I need further inquire into, is, whether

the taking of a note as collateral security, places this case, as to authority and principle, upon a footing different from the two cases last referred to. I have already intimated that the *reasoning*, in the case of *Bond* vs. *the Central Bank*, covers this case. I can say the same of the case of *Swift* vs. *Tyson*, 16 *Peters*. It is true that Mr. Justice Catron found himself, in that case, in a state of dubitation upon the question I now consider. But the Supreme Court, through Mr. Justice Story, say, " We have no hesitation in saying, that a pre-existing debt does constitute a valuable consideration, in the sense of the general rule already *stated*, as applicable to negotiable instruments. Assuming it to be true (which however may well admit of some doubt from the generality of the language) that the holder of a negotiable instrument is unaffected by the equities between the antecedent parties of which he has no notice, only where he receives it in the usual course of trade and business for a valuable consideration before it becomes *due,* we are prepared to say, that in receiving it in payment of, *or as security for, a pre-existing debt,* is according to the known usual course of trade and business." Here then is the authority of Story and the Supreme Court, higher than which is not found in the history of men and courts. We might rest our judgment upon *that* alone. The precise question under review has been determined in accordance with Judge Story's opinion, in Connecticut, and in England. *Savings Bank* vs. *Bates*, 8 *Conn.* 505; *Heywood et al.* vs. *Watson*; 4 *Bingham*, 496 ; (38 *English C. L. R.* 277;) 16 *Peters* 1.

*A pre-existing debt,* is a valuable consideration to sustain a note in the hands of an indorsee under the rule. 3 *Kent Com.* 79, *note.* The chancellor, in the note referred to, makes no distinction between a pre-existing debt paid, and one secured ; a pre-existing debt is simply stated to be, a valuable consideration to sustain a transferred note. *See also* 11 *Ohio R.* 172; 11 *Conn. R.* 388 ; 21 *Wend.* 499 ; 24 *id.* 115 ; 1 *Hill N. Y. R.* 512; 2 *McLean. R.* 589. If the payment of a pre-existing debt is a valuable consideration under the rule, why should not the transfer of notes as security be so also ? What is the difference upon principle ? The making good a doubtful debt, or the strengthening of a debt already good, is valuable to the transferree. The forbearance to press the debt, which is usually a part of the understanding of the parties in such cases, is valuable to the transferor. He parts with, and the transferree acquires, the legal title to negotiable paper

thus transferred—the latter may sue on it in his own name—and, although the original debt is not extinguished, the creditor has the right to apply the proceeds of the securities, when realized, to its extinction ; nay he is bound to do it, and whatever he does realize on them, is a payment *pro tanto.* Further, he is bound to reasonable diligence in collecting. The transfer thus of available security, is a payment, so far as sureties, if there be any upon the original debt, are concerned. They can compel their application to it ; and, if collectible, and not collected through gross negligence, they are discharged. Such well settled principles as these, seem to me to demonstrate, that the transfer of a negotiable note, as collateral security for an existing debt, in the sense of the rule, is for a valuable consideration. 1 *Story Eq. sec.* 326 ; 4. *John. Ch. R.* 123; 2 *id.* 554 ; 6 *Vesey* 734.

Let the judgment of the Court below be affirmed.