No. 46.—John T. Meadow, plaintiff in error, vs. John Bird, defendant in error.

[1.] A note given for professional services rendered by an attorney, on an application for a pardon to the Legislature, in explaining legal principles to the members, and in explaining testimony and arguing its legal effects in such language as one gentleman would use to another in discussing the merits of a subject, is not illegal, because contrary to public policy. .

[2.] A note, illegal in the hands of the payee, because contrary to public policy, is not, therefore, void in the hands of a *bona fide* holder, being transferred before due, and for a valuable consideration; neither is it void in the hands of a holder as *collateral security for an existing debt*, provided it be transferred before due, and for a valuable consideration, and without notice of the taint in the consideration.—Lumpkin, J.

W., an attorney, at the request of B., supported an application to the General Assembly for a pardon, by reading the testimony to individual members thereof, and by explaining and arguing to them its legal effect. B., in consideration of this service, gave W. his note. W., before the note fell due, transferred it to M., in payment of a debt he owed to M.—M. knowing nothing of the consideration.

The note was good as between B. & W.

But even if it was not good as between them, it was good as between B. and M.—Benning, J.

Meadow vs. Bird.

Assumpsit; from DeKalb Superior Court. Tried before Judge BULL, at October Term, 1856.

This was an action on a promissory note, brought by John T. Meadow, as bearer, against John Bird, maker. The note was made payable to one G. J. Wright or bearer, and by him transferred to plaintiff. The amount of the note was five hundred dollars, payable six months after date, and dated 22d November, 1853.

The defendant Bird, pleaded that the note was illegal and void, being given upon consideration that said Wright would go to Milledgeville during the session of the Legislature, and use his influence with the members, to obtain a pardon for Elijah Bird, the son of defendant, who had been convicted of murder, and was under sentence of death.

Wright was an attorney at law; Bird was pardoned by the Legislature. The note was transferred to Meadow before its maturity.

The presiding Judge charged the jury that it was against public policy for the Legislature to be influenced or controlled in acting on matters of public interest, by outside influence upon the members, procured to be exerted for hire; that if the consideration of the note was services to be rendered by Wright in influencing or attempting to influence the members of the Legislature, by personal solicitation or any such means, to vote for the pardon of a condemned criminal, it was absolutely void, and that it made no difference whether the person employed was an attorney or not; that the note, if given upon such consideration was *void* in the hands of the plaintiff, although he may have received it *bona fide, before due*, for valuable consideration, or as collateral security, and without notice of the illegal consideration upon which it was founded. To which charge plaintiff excepted. The jury found for the defendant, and plaintiff, by his counsel, excepts and brings his bill of exceptions, and assigns as error the charges aforesaid of the presiding Judge.

Meadow vs. Bird.

T. W. J. HILL, for plaintiff in error.

HAMMOND & SON, for defendant in error.

*By the Court.*—LUMPKIN J. delivering the opinion.

From the novelty of this case, in this State, I have looked a good deal into it, and am prepared to give my opinion respecting it. The facts are few and uncontradicted.

"I did render service for the same" (says Wright, who was made a witness by the *defendant*) "with various persons whose names are not now recollected by me in particular. The service was such professional service as an attorney would render in explaining legal principles to those unacquainted with them. I did not influence any person that I know of, though I used all lawful means to do so, with various members of the last Georgia Legislature, by reading testimony and explaining and arguing its legal effects to them. I do not recollect what was the precise language used, but it was such as one gentleman might use to another in discussing the merits of a subject."

Here then, is the consideration of the $500 note sued on, and given by John Bird to the witness, who was an attorney at law.

Upon this proof the Court charged the jury, "That it was against public policy for the Legislature to be influenced or controlled in acting on matters of public interest, by outside influence on the members, procured to be executed for hire; that if the consideration of the note was for the services of the payee, in influencing or attempting to influence the members of the Legislature by personal solicitations or any such means, to vote for the pardon of a condemned criminal, it was absolutely void, and that it made no difference whether the person employed was an attorney or not."

To which charge counsel for plaintiff excepted.

The Court is unanimous in holding that, the judgment below must be reversed, upon the ground, that there was no

Meadow vs. Bird.

evidence before the Court, that the services rendered were "to procure the pardon of a condemned criminal." The defendant had omitted to introduce any testimony to that point.

But supply this deficiency, for such no doubt was the fact, and what is the law of the case?

We are not the advocates or even the apologists of the evil intended to be rebutted by the instructions given by the Circuit Judge to the jury. We concede the fact, that there is too much reason to believe that legislation in this country has in some instances, been contaminated by sinister and selfish influences. *I do not speak of this State, for I know of no such instance.* But I am fully warranted in coming to this conclusion, in view of the painful exposures recently made in our national Congress; already has a class of persons been established at Washington City, and elsewhere, who make it a business to push through private claims and private acts *per fas et nefas.* How easy the transition from the compensation of agents, to the pay of members, late developments abundantly prove. The consequence is, a wide spread and growing suspicion of want of public morality in that branch of the government, without which the national fabric would crumble to ruins. No man sees more clearly or feels more strongly, the necessity and importance of preserving pure the fountain from which issues, not only all of our general laws, but, the innumerable private acts for railroad and banking corporations, pecuniary aid to associated enterprises, which grow with our rapid growth, and multiply with our rapidly increasing wealth and population. Still the question recurs, is *this contract* illegal and void?

It is admitted that it is untrammeled by authoritative decisions, and must be determined upon general principles.

It will be found upon examination, not only that the books are full of cases to this effect, namely: That the law will not aid in enforcing any contract that is illegal, or the consideration of which is inconsistent with public policy,

sound morality or the integrity of the domestic, civil or political institutions of the State: But to come closer to the point at bar. It has been decided, and we will not say incorrectly, that a contract to procure, or endeavor to procure, the passage of an Act of the Legislature, by any *sinister* means, or by even using a *personal* influence with the members, would be void, as inconsistent with public policy and the integrity of a political institution: Nay, more: precedents are to be found, in which it is maintained, that any agreement for a *contingent fee*, to be paid upon the passage of a legislative Act, would be illegal and void; because it would be a strong incentive to the exercise of personal and sinister influences to effect the object.

Beyond this, the reported cases do not go; and none of the doctrines thus announced, embrace the case under consideration.

*Wood vs. McCann*, 6. *Dana's Kentucky Reports* 366, is cited not only by Chitty on Contracts, as a leading case in support of the doctrine, that contracts contrary to public policy are void; but it is referred to by most of the American Courts with approbation, who have had this doctrine under consideration, and was mainly relied on in the argument before us. Perhaps a stronger cannot be found.

There, as everywhere, the Court admitted the patent fact, that it was all important to just and wise legislation, and therefore to the most essential interest of the public, that the Legislature should be perfectly free from any extraneous influence, which may either deceive or corrupt the members or any one of them; an influence exerted too, not from public or patriotic motives, but from those which are altogether mercenary and selfish; and yet the Court held—though doubtingly it is true—that a declaration, averring in substance, that the defendant bound himself to pay to the plaintiff $100 to attend the Kentucky Legislature, to get a bill passed legalizing the defendant's last marriage, and divorcing him from his former wife; and averring also, that the plaintiff did attend,

Meadow vs. Bird.

and that at his instance and request, such an Act was passed and approved, whereby defendant was released from all liability, &c., does not describe a contract for a *contingent fee,* nor one so clearly *malum in se,* that the Court can pronounce it void and reverse a judgement rendered upon it by default. And the conclusion of the Court was, that jealous as the law and its judicial organs should ever certainly be of such contracts as that they were considering, still there was scarcely enough in the record to authorize the Court to decide, *as a matter of law,* that the note on which the judgment below was rendered, was given for an illegal or vicious consideration, and was therefore not *legally* obligatory.

Compare the facts in the case before us with this, and the contrast is striking. The services rendered by Wright and the influence used by him, was as an attorney at law, for a fee certain, in "explaining" to the *lay members* of the Legislature, "legal principles; and in explaining the testimony and arguing its legal effect to them;" and this in language "which one gentleman would use to another in discussing the merits of a subject."

This is the precise case made by the record. And it is obvious, whatever the further and future proof may be, that it is not a contract as it now stands upon Wright's testimony, to procure or endeavor to procure the pardon of a condemned convict, by any *sinister* means, or even by using a *personal* influence with the members; nor is the consideration *contingent* or dependent upon success.

Direct authority might be adduced from England in support of this contract. But I forbear, upon the ground, that learned Judges in this country have held, that it is unsafe to rely on a precedent coming from such a source, when we reflect upon the different manner of conducting business there and here. I need not specify them.

I know how economical the Legislature is of its time, still I am not prepared to say, that it would not be wise, in applications for a pardon, to allow feed counsel, without impro-

priety, to prepare and present the petition before the Legislature, to make an exposition of the law and the facts, and to advocate the adoption of the measure; to be answered by the Attorney or Solicitor General of the Circuit where the trial was had; and in all private acts, to permit an appearance by attorney before the committees charged with the subject. To legalize such a system, would not only rid the Legislature of *lobby agents* and the swarms of hired retainers by which it is now surrounded; but would cause business to be conducted with more circumspection and candor; and not under those covert influences, so dangerous and detrimental, both to private rights and the public weal.

In the absence of any such provision, I cannot divest myself of the idea, that the services rendered in just such a case as this, should not go uncompensated. Suppose the maker of this note to be an aged and ignorant man. His son has been consigned to the gibbet by the Courts. His hope for life is in the pardoning power of the Legislature. It may be that evidence vital to the convict's case has been discovered since even the decision by the appellate Court; or some other thing occurred, which, in a civil case, would induce a Court of Chancery to interfere and grant relief against a judgment at law. It is important that the case in its new phase should be properly presented to the Legislature. Were the prisoner the son or brother or relative of a lawyer, who, with all his zeal for legislative purity, would say, that it would be contrary to sound morality or public policy, for this professional friend to aid and abet, to the extent that Wright did, in procuring the pardon of this kinsman? If there be such a man amongst us, he belongs to that age, when Brutus could sentence the child of his loins to the lictor's axe, and not to this, when justice is tempered with mercy. And if this would not be condemned, why may not this illiterate old man employ another to do that which he cannot have done otherwise, which he is unable to do himself, and which is in and of itself untainted with turpitude? The Legisla-

ture of this State saw nothing wrong in employing and paying liberally an agent to prosecute her claim upon the General Government. Why may not John Bird do likewise? Is money dearer than the life of a son? And if it should be said, that if we give countenance and a legal sanction to this attempt, which is an entering wedge, it is impossible to foresee the train of evils of which it may be the prolific parent. Our reply is, sufficient unto the day is the evil thereof: Every case must stand upon its own merits; and above all, the Legislature, always having truth and justice before their eyes, is abundantly able to protect itself. It would not be decorous in this branch of the Government to impute to that body, either the want of ability or inclination to do so. The result of our investigation upon this branch of the case is, that the services rendered by Wright, as testified to by himself, and for which the note sued on was given, were not of such a character as to compel this Court as a matter of law, to declare the contract illegal and void.

[2.] John T. Meadow, plaintiff in the action, testified, that in the forepart of the year 1854, Wright, the payee of the note, was owing him between two hundred and fifty and three hundred dollars. That Wright was not able to pay him, and placed in his hands John Bird's note for five hundred dollars, not then due. Witness took the note, and was to give Wright credit for the amount he owed him, and the balance pay over to Wright when collected."

The Court upon this evidence charged the jury, "that if Bird's note was given upon the consideration above stated, it was void in the hands of Meadow, although he may have received it *bona fide* before due for a valuable consideration, or as collateral security, and without notice of the illegal consideration for which it was given."

To which plaintiff, by his counsel, excepted.

That the charge upon this branch of the case was erroneous in one view of it, and, that too, in the sense in wich the Judge intended it to be understood, we cannot doubt. The

idea of the Judge was, that if Bird's note was illegal in the hands of Wright, because contrary to public policy, then it was void in the hands of an innocent holder, who traded for it before due, and upon a valuable consideration. The Courts have not yet gone to this extent. And here, if the proof shows, as we are inclined to think it does, that Meadow took, not as collateral security, but in payment of a pre-existing debt, the residue or overplus to be turned over to Wright, when collected, we apprehend there would be no difference of opinion, that Meadow would be protected, notwithstanding the taint in the consideration.

But, admitting that it was received and held by Meadow as collateral security only, can he be affected by the alleged vice in the original consideration ?

In *Gibson et al. vs. Conner*, 3 *Ga. Rep.*, 47, this Court held that a note in the hands of a holder, for a valuable consideration, transferred before due, and without notice of any equities between the maker and the payee, as *collateral security for an existing debt*, is not liable to the equities between the maker and the payee. In other words, we put an absolute transfer, and a transfer by way of pledge, upon the same footing, so far as the rights of the holder are concerned.

We are aware that much authority can be found to the contrary of this doctrine, especially in this country. At a more convenient season, we may, if opportunity occur, give a more thorough examination to this question. At present we shall content ourselves to rest upon the decision, as this opinion is spreading out to a most alarming length. We shall content ourselves to dismiss this point with a single remark, seeing that we deem the note valid even in the hands of the *payee*, and it is this : to the extent of the creditor's interest in the collateral security, we can see no good reason why he should not be protected for the same reasons than an absolute holder would be. Why should he be put upon inquiry, as to the consideration of a note not due ? And does he not suffer to the extent of his lien, as much as the holder,

for want or failure of consideration on the contract? He might have taken other security, had he been apprised of any defect in the paper. Why is he not an innocent holder in legal contemplation?

Judgment reversed.

BENNING, J. concurring.

The General Assembly have power to pardon convicts of murder or treason. *Art. 2, Sec. 7, Cons. of Ga.*

It would seem to follow, that such convicts have the right to apply to the General Assembly for a pardon. Such a right, if it exists, must of course, include the right to support the application, by a presentation of their case, in its law, and in its facts, to the General Assembly.

. But how can convicts exercise this right, except by approaching the General Assembly through individual members of it? There is no mode provided by which they may appear before the General Assembly in its collective capacity. To say, therefore, that they are not to appear before the individual members of it, is to say what might amount, practically, to a denial to them of all right of applying for pardon, with the inclusive right of supporting the application by a presentation of the law and the facts of their case. How else can the pardon-seeking convict open his business, except with individual members of the General Assembly? Who but a member can ever present his application to the General Assembly?

I think therefore, that a convict of murder may lawfully lay his application for pardon before each member of the General Assembly; and may, in support of the application, present each member with the facts and the law of his case.

But if it is lawful for the convict to do this by himself, why is it not lawful for him to do it by attorney? To say that he shall not do it by attorney, is to say that he shall not

do it at all; for he cannot do it by himself; he is confined in a distant jail. I think, therefore, that he may do it by attorney.

If he may do it by attorney, then the services of the attorney by whom he does it, may constitute a legal consideration for a promise on his part to pay money to the attorney, *Lampleigh vs. Brathwait*, 1, *Smith's Lead. Cases* 67. *Formby vs. Pryor*, 15 *Ga.*, 258.

But the first of the two charges of the Court below, interpreted by the facts in evidence, said, in effect to the jury, that such services of the attorney could not be a legal consideration for such promise of the convict. That charge was therefore, I think, erroneous.

Grant, however, that the Court was right, and therefore, that such promise was void, still I say, that it could not have been void absolutely; but could have been void only as between the promisor and the promissee, and the assignees, with notice, of the latter.

" But, unless it has been *so expressly* declared by the Legislature, illegality of consideration will be no defence in an action at the suit of a *bona fide* holder, without notice of the illegality, unless he obtained the bill after it became due." *Chitty on Bills*, 116. This position is, I think, well supported by authority.

Meadow was a *bona fide* holder, without notice of the illegality of the consideration, if the consideration was illegal. He obtained the note from Wright, the payee in it, by giving up to Wright a debt which he held on him. He took the note in *payment* of that debt—not as *security* for the payment of the debt.

The note, therefore, in Meadow's hands, must have been valid, at least to an amount equal to the amount of the note given up to Wright. But, according to the second of the two charges of the Court, the note was wholly void.

I think, therefore, that this charge also, was erroneous.

Meadow vs. Bird.

McDonald J. dissenting.

There are two points in this case, upon which I have the misfortune to disagree with the Court. The first is, whether the illegality of the consideration of the note sued on, can be set up against this plaintiff; and-secondly, if it can be set up against him, was it illegal for the payee to contract with the maker of the note, to render him professional services, by attempting to use influence with members of the Georgia Legislature, by reading testimony and explaining and arguing its legal effects to them. The majority of the Court sustain the negative of both of these propositions. I hold the affirmative of both to be the law.

It appears from the evidence that the note was payable to G. J. Wright, or bearer, and that he was indebted to the plaintiff in the sum of two hundred and fifty, or three hundred dollars, and he placed in his hands the note sued on, it being a note on John Bird, for five hundred dollars ; and he was to give Wright credit for the amount he owed him, and the balance to pay over to Wright when collected. Wright retained an interest of nearly one half, if not quite, in the note. To that extent it was his own. The other part of the note he transfered to plaintiff who *was* to give him credit when it was collected. He did not give up the claims on G. J. Wright, nor did he credit the claims with any amount on account of the note. To the extent, then, of his demand on Wright, he received the note as collateral security. Nothing more. Under this statement is the plaintiff such a holder of the note, for a valuable consideration, in the usual course of trade, as to preclude the defence sought to be set up ? He is the holder of the note; It was transferred to him by the payee, and being payable to bearer, the mere delivery of the note to him for the consideration stated in the evidence was a sufficient transfer of the property in the note to authorize him to sue upon it. But the mere right to sue s not conclusive of the question. A plaintiff to whom a

note is transferred after due or with notice of defences, has a property in it and he may sue upon it, but that does not preclude the maker's right to put up the same defences against the note when sued by him, that he would have had a right to plead, had the action been in the name of the payee. If the transfer be void, then the transferee has no property in the note, and can not sue, whatever the consideration of the note may have been, and however unimpeachable it might be in the hands of the original payee, or a holder, *bona fide*, and for a valuable consideration. No case like this has been before this Court, and therefore, the precise case has never been adjudged by it, but I admit that the only difference between this case and *Gibson et al. vs. Conner* 3 *Kelly*, 47, is, that, in that case, there was an *implied* trust, to refund to the debtor any balance that might remain after paying the debt, which the note was transferred to secure; while in this case, there was an express agreement to that effect. That case decides, that "a note in the hands of a holder for a valuable consideration, transferred before due, and without notice of any equities between the maker and the payee, as *collateral security for an existing debt*, is not liable to the equities between the maker and the payee." That case is the one before us, with the exception stated. The plaintiff has an interest of between two hundred and fifty and three hundred dollars in the note; the balance belongs to the payee.

In the case of *Gibson et al. vs. Conner*, the learned Judge, who pronounced the judgment of the Court so ably, says that he considers the principle involved there as having been settled by this Court in the case of *Bond against the Central Bank* and the whole Court thought that, whether the plaintiff received the note in payment of, or as collateral security for, a pre-existing debt, he was not liable to the equities between he original parties, unless he received it after maturity or with notice of these equities. I regret that I cannot concur n the judgment rendered in that case, and it is with great diffidence, that I venture to differ from gentlemen of so much

Meadow vs. Bird.

ability as those who presided in that case, supported as they are by the profound legal learning of my brother, who presides with one of them and myself in this case.    I must assign my reasons :

I think that when the cases are examined, there will be found a great distinction in principle, the reason of the case, and the authorities, between the rights of the maker to defend or to be let into equitable defences against a party who received a note by transfer before due, without notice of equities between the maker and the payee, in *payment and extinguishment* of a pre-existing debt, which the creditor *gives up or cancels* at the time, and one who holds it as *collateral security* of a debt against the payee, the evidence of *which he retains*.    The question in the case of *Bond against the Central Bank of Georgia* was whether the bank which received the note sued on *in payment* of a pre-existing debt, before due, without notice of equities between any of the parties to it, was a *bona fide* holder, so as to exclude the equities claimed as subsisting between the original parties to the note as a defence.    It was a long time a matter of contest in the Courts, whether a note taken in *payment* of a debt due, which *was extinguishe l*, and the evidence of it, as a promissory note, was surrendered to the party, was a note taken in the usual course of business.    It was seriously contended that it was not, but it is well settled now, that when a note is taken in payment of a pre-existing debt, or of a debt contracted at the time, and that debt is *extinguished thereby*, so that no action can be supported for the recovery of it, on the failure of the party receiving the note in payment to collect it, the note is taken in the usual course of business, and the matters are settled, and at an end, so far as the parties to the transaction are concerned.    In the case of *Bond vs. the Central Bank* , this principle was acted on and enforced.    The bank retained no claim on Beall, it had settled and surrendered his note, extinguished his debt, and it could not have had, on any

contingency, a right of action against him.    The case of *Gibson et al vs. Conner*, is widely different.

Jernigan, Lawrence & Co., transferred the note sued on as collateral security only, to Stewart & Fountain.    The latter, notwithstanding the transfer, held on to the note or other evidence of debt, which they held against Jernigan, Lawrence & Co.    If they had lost by the insolvency of the maker, or by defences, the entire amount of the note sued on, they would have been in no worse condition than when they received the note.    The transfer of the note by Stewart & Fountain to Henry W. Conner, was a collateral security also, and like Stewart & Fountain, he would not have been placed in a worse condition than he was when he received it, if he had been defeated in his suit, for he retained the liability which he took it to secure.    In all such cases, the creditor takes the security for what it is worth, and no more. If he fails to collect it, he still holds on to his original debt. He assumes the position of his debtor in relation to the maker of the note.    Any other rule would seem to be extremely unjust and oppressive to the maker, who might have a just and sufficient defence against the payment in the hands of the payee.    The rule does not embarrass commerce in the slightest degree.    The creditor knows, when he receives negotiable securities *as collaterals*, the terms on which he receives them, and he should inform himself by suitable enquiry, of their availableness in his hands, before he incurs expense in efforts to collect them.    The case of *Swift vs. Tyson* 16 *Peters*, 1, is a very high authority as a decision on the point before the Court in which it was decided ; but that point is not the one presented in the record before us, nor in the case of *Gibson vs. Conner*, and the only part of the judgment of the Court pronounced by Justice Story, and which is insisted on as applicable to this case was a mere *obiter dictum* of the Court, for it was not necessary to the decision of the case.

The bill of exchange had been accepted and the accep-

Meadow vs. Bird.

tance was indorsed to the plaintiff, before it became due, without notice of anything in the transaction between the parties to the acceptance which would impeach its consideration. It was taken in payment of a promissory note due to him by parties, of whom the payee was one. On the transfer of the acceptance to the plaintiff, he gave up the note in payment of which he received it. For this latter statement, see facts presented by plaintiff's counsel at page four, and the protest of Judge Catron, in which he says he was "unwilling to sanction the introduction into the opinion of the Court, a doctrine, aside from the case made by the record, or argued by counsel, assuming to maintain, that a negotiable note or bill, pledged as collateral security for a previous debt, is taken by the creditor in the due course of trade ; and that he stands on the footing of him who purchases in the market for money, or takes the instrument in extinguishment of a previous debt." There is nothing in the record in that case to show that the acceptance was received by the plaintiff *as security* for a pre-existing debt, and yet, Judge Story, in speaking of a negotiable instrument generally, remarks, that the Court " are prepared to say, that receiving it in payment of, or as security for a pre-existing debt, is according to the known and usual course of trade and business." If Judge Story had omitted from his opinion, the expression "or as security for a pre-existing debt," and the arguments used by him to support it, the opinion pronounced by him would have been warranted by the record before him, and in accordance with adjudicated cases, and in authoritative judgment of that Court, and entitled to the highest respect in all judicial tribunals not bound by its decision. But an *obiter dictum* cannot be regarded as authority any where. The cases on this point have been most ably reviewed by Chancellor Walworth in the case of *Stalker vs. McDonald*, 6 *Hills Rep.*, where he sustains fully the right of the maker of a negotiable instrument, transferred to a creditor as collateral security, to go into all defences in a suit by him, that he could have made against

the payee had he been the plaintiff.    If Bird should be com-
pelled to pay the debt sued for in this case, to the present
plaintiff, (if his defence would be good against the payee were
he the plaintiff,) he will be subjected to great inconvenience,
expense and probably to eventual loss to the extent of the note
sued on, while, if he were allowed to make the defence, and
that defence should be sustained, the plaintiff would be only
remitted to the position he occupied before he received the
note.    He has not given up or extinguished the debt of
Wright.    I think, therefore, that according to the law, reason
and justice of the case, he ought to be allowed to go into his
defence, that the plaintiff holds the note under circumstan-
ces which admit the defence.

There was no division of opinion in the Court on the point
made in the argument and insisted on, as within one of
the exceptions to the charge of the Court to the jury brought
up in the record before us, to wit: that the charge was not
justified by the facts in the proof in this, that the proof
did not warrant the Court to say to the jury, that if the con-
sideration of said note was for the services of the payee, in
influencing or attempting to influence the members of the
Legislature by personal solicitation, or any such means, to
vote for the pardon of a condemned criminal, it was absolute-
ly void, and that it made no difference whether the person
employed was an attorney or not.    The objection was that
there was no evidence that the note was to be given on the
pardon of a condemned criminal.    The testimony is, that
the note was given in Milledgeville, and that the payee ren-
dered services for it, with various persons; the service was
such professional service as an attorney would render in ex-
plaining legal principles to those unacquainted with them;
the payee did not influence any person that he knew of,
though he used all lawful means to do so with various mem-
bers of the Georgia Legislature, by reading testimony and
explaining and arguing its legal effects to them.    Such was
the consideration for which the note was given.    It was for

Meadow vs. Bird.

influencing or attempting to influence members of the Legislature; that influence was exerted by reading testimony and explaining and arguing its legal effects to them. It was then, clearly inferable from this evidence that there was some matter or thing before the Legislature on which it had to pass. It was a matter in which evidence of some sort and for some purpose was before the members. It was not usual for the General Assembly to call for evidence to enlighten them in reference to matters connected with their ordinary duties of Legislation. It is sometimes done in special cases. But the law requires that the judges, on the trial of persons for capital offences, and for offences, the punishment of which is confinement in the penitentiary for one or more years, to take or cause to be taken down in writing, a memorandum of the testimony of all witnesses, who testify on the trial, and on conviction of the party arrested, the evidence given on the trial is to be recorded.

A certified copy of this evidence is required by statute to accompany all applications for pardon. By the Constitution, the Legislature has the power to grant pardons for treason and murder, and for no other offences against the criminal laws. The Court had a right to charge upon the issue before the jury with reference to the facts and the law, expressing or intimating no opinion, however, as to what has or has not been proved, or as to the guilt of the accused. Assuming then, that the Court's charge to the jury was justified by the proofs before it, I shall not consider whether it was right in point of law. It is insisted that the influencing or attempting to influence, for a consideration, members of the Legislature to vote for the pardon of a condemned criminal, is not illegal, and that a note given for such service is not void between the original parties, or if the note be transferred, it is not void, on that account, in the hands of a holder, under whatever circumstances he may hold it. I am of opinion that a note given for such a consideration is void. I think it is void because it is against public policy.

If our laws are wise and necessary to the public safety, they ought to be executed. They are to be presumed to be wise and necessary, as long as they are on the statute book. If they are unwise and unnecessary, they ought to be repealed. If a man violate a public law, as the law against murder, and is prosecuted for it, and is found guilty by the jury, and after exhausting all legal means of escape from the verdict of the jury, or acquiescing in its justice, receives the sentence of the law, and applies to the competent authority for a pardon, the question with those who have the power of pardon should be, whether there is any thing in the circumstances of his case, which should make the law against murder a nullity, as to him. When convicted by a jury, *he is guilty*, and he must remain so, unless judgment be arrested, or a new trial be granted to him. When he receives the sentence of the law, his *rights*, as to defence against the accusation and to exemption from punishment, cease. His guilt is a verity, and his punishment follows. Those with whom the people have entrusted the power of pardon, may remit his punishment and let him go. If they do this, it is not in consequence of any *right* which remains in the convict. It is the work of mercy. It is the pardon of a guilty man. Those whose high constitutional duty it is to exercise this power, will always, no doubt, act with great deliberation, and exercise their soundest judgment, and determine whether the safety of society will admit of the pardon; for a false notion of mercy to the the supplicating convict, may be a great outrage upon society. It may encourage wicked men, who meditate the most serious offences against society, to hope that if they should perpetrate the crime, and be detected and convicted, pathetic and influential appeals to the pardoning power might so operate on its sympathies as to secure their ultimate escape from punishment. Public policy, then, which certainly would not forbid a consultation and conversations between a member of the Legislature, and persons who are not members, on the subject, to obtain the benefit of a friend's judgment, requires

Meadow vs. Bird.

that appeals from mercenary men, who present themselves as disinterested zealots in the cause of mercy and justice, should not be tolerated. The members of the Legislature, who are enquirers after truth, and anxious to discharge their responsible duties to the country, cannot tell, when they are approached by a gentleman on the subject of a pardon, whether he is a disinterested person, or one feed to obtain a pardon. The opinion of the latter is worth nothing, while the views of the former might be entitled to great consideration.

The payee of the note sued on, says that he does not recollect the precise language used by him in his intercourse with the members, but it was such as one gentleman would use to another in discussing the merits of a subject. Unquestionably it was, for he would not have approached a member in any other manner, and the greater the injury to the public interest, for had he said to him, I am employed to obtain a pardon in this case, it will be much to my interests if you will vote for it, and proceed to read and explain the evidence, and argue the case, it would be so open an attempt to cause him to swerve from his duty, as to amount to an insult. The payee of the note says he read and explained the evidence, and argued its legal effects to members. His services were such as an attorney would render in explaining legal principles to those unacquainted with them.

How would an attorney explain legal principles, as an attorney in a cause? In such a manner, of course, as suits the side of the cause he is advocating. He does not argue them before the Legislature, where there are many lawyers, but to members unacquainted with legal principles, outside of the Legislature. He treats the Legislators as triors of the case again, but does not appear before the body, but plies the judges and jurors separately with his explanations and arguments. It is said that the applicant had the right to be represented by attorney. A condemned criminal has no such right. When on his trial, he enjoyed the great constitutional privilege of being heard by himself or his counsel, or both·

There is great danger to the public safety and interests in allowing cases to be argued from day to day, before the Legislature as though the convict were on his trial.   The Legislature has no judicial powers, and it cannot organize itself constitutionally, into an appellate judicial tribunal to hear the case again.   It is said, the evidence is taken down, and is required to accompany the application for a pardon, and if the Legislature cannot enquire into the guilt of the party, why send the evidence?   The answer is easy.   To enable the Legislature to determine for themselves whether there is any thing in the circumstances of the case that, in the judgment of the General Assembly, commends him, though guilty, to their mercy.   And again, it sometimes, but very seldom happens, that evidence comes to light after the conviction and sentence and the adjournment of Court, which could not have been discovered or had by any possible diligence on the trial, which, taken in connection with the evidence, very probably (a strong probability) would have produced an acquittal.

It is said that a citizen may take a fee to procure legislation on any subject, and in support of private claims.   I concede it with this explanation.   If either house of the Legislature agree to hear evidence and argument in support of a private claim, or any proposed measure, before the house or a committee of the house, I have no doubt that public policy is not in the slightest degree infringed, by the employment of counsel to present and explain the claim or other matter before the house or committee.   But it is otherwise, if the parties choose to employ counsel to approach individual members with arguments privately.   The same arguments, if made publicly, other members might answer and refute.   I might point to the circumstances attending the passage of the Yazoo Act, to show how dangerous to the public interests mercenary lobby members are, and how necessary it is to keep the fountain of the law pure, and to allow no hands to dabble therein, except those who carry with them the authority of the people.

Meadow vs. Bird.

The principle contended for by the defendants in error, was l.·ng ago decided in England by Lord Elden, in the case of *Norman vs. Cole, 3 Espinasse* 253. In delivering the opinion Lord Elden said that "when a person interposes his interest and good offices to procure a pardon, it ought to be done gratuitously, and not for money; the doing an act of that description should proceed from pure motives, not from pecuniary ones." See also, *Hutzfield vs. Gulden, 7th Watts,* 152. The case of *Formby vs. Pryor, 15th Geo. Rep.,* 258, is no precedent nor authority for the plaintiff in error in this case. That was an application to the Governor for a pardon. The application here was to the General Assembly. In that case, the Governor allowed the party applying, to submit evidence to him. In this case, the General Assembly allowed no such thing; if it did, it does not appear.

In that case, the Governor allowed no evidence of the innocence of the party, but the evidence was consistent with the guilt of the convict, but went to establish facts and circumstances to bring the case within the legitimate purposes of the pardoning power. Here it does not appear that there was any evidence but that given on the trial, and communicated under the statute, with the application for the pardon, and it is clearly inferable, from the evidence, that the effort to influence members to vote for the pardon, was to prove that the convicted person was not guilty; a position that the pardoning power ought not to allow, and a fact that it should not permit to be controverted. There the evidence and argument, if any, was before the pardoning power, the whole power being in the Governor, here it was not to the body having the power of pardon, but to individual constituent members of that body, separate and apart, or at least, not assembled as an organized body, there the evidence was read and expounded. When I say the guilt of the party is a fact that the pardoning power should not allow to be controverted, I do not mean that it is a matter on which they should not exercise their own judgment from the evidence before them, for it might happen

that in the minds of Legislators, the evidence of guilt to warrant the conviction was so slight as to imply, strongly, that it must have been produced by unjustifiable causes. Organized as our judiciary is, however, such cases can seldom, if ever arise. I mean that the Legislature should not re-try the case. But it is replied, shall an innocent man be punished. *Unquestionably no.* But if he be innocent, the majority of a body, composed of upwards of two hundred enlightened men, will easily discern it, without extraneous aid. But the pardoning power was conferred on a constituent part of the government, mainly for the pardoning of the guilty. In the exercise of the power, functionaries entrusted with it, should never forget that the pardon of the convict, in this particular instance, is equivalent to the repeal of the law against the crime, as to him. There should be strong reasons for it, such as that by the pardon the government would derive information in respect to other offenders, more important to the interest and safety of the country than the punishment of that individual; that, though guilty, and the convict was of sufficient mind and age to be capable of committing a crime, yet he was of a capacity so weak, and an age so tender, that he was made the dupe of stronger minded, depraved men; or, as in cases of riot, resulting in murder or other high crime, when the outrage was planned and gotten up by a part of those only convicted, and others were unwittingly led into it or too weak to resist tumultuous appeals to join, and in all such cases, then it might be considered that the punishment of the principal offenders alone would answer all the objects of punishment. It is unnecessary to attempt to state all the multitudinous cases in which it would be proper to pardon a convicted man. It is sufficient for me to say, in conclusion, that I consider it opposed to the best and wisest public policy, to permit men, for pay, to attempt to impress the mind of the pardoning power, either for or against the exercise of that power, in any case; that it ought to be left free to act on its

own impressions of the public good, uninfluenced by the importunities of interested and paid agents, and that I am, of course, for affirming the judgment of the Court below.