## COYNE v. SUPERIOR INCINERATOR CO. OF TEXAS.
### No. 149.

Circuit Court of Appeals, Second Circuit.
Jan. 6, 1936.

Compton, Dillon & Clark, of New York City (Thomas K. O'Brien and Beverly C. Cobb, both of New York City, of counsel), for appellant.

Nevius, Brett & Kellogg, of New York City (Asa B. Kellogg, of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This is an action at law tried to a jury of one to recover the balance due on each of two contracts made by the defendant with one Freiberg, the plaintiff's assignor. The suit was removed from the New York Supreme Court for diversity of citizenship; the defendant being a Delaware corporation and the plaintiff a resident of New York. The sole defense below, and the only question here raised, relates to whether or not the contracts are unenforceable because contrary to public policy. When the plaintiff rested, both sides moved for a directed verdict on undisputed evidence. The appeal is from a judgment for the defendant entered on the verdict directed for it when its motion was granted.

Freiberg had long been a resident of Cincinnati, Ohio, who was acquainted with many of its officials and influential citizens when he was employed by the defendant for the express and particular purpose of selling to that city an incinerator plant of the defendant's manufacture. His compensation was to be an agreed percentage of the selling price, and was contingent upon success. He was successful, and was paid part of his agreed commission. The first cause of action is for the recovery of the balance in accordance with the terms of the contract. There is no controversy over the amount due, provided the contract is enforceable.

The second cause of action, in all essential respects conceded to be like the first, relates to a contract for a contingent commission to be paid Freiberg for selling one of the defendant's incinerators to the city of Fort Thomas, Ky. A part of the agreed commission was paid, leaving a balance undisputed in amount still due provided the action can be maintained.

Freiberg was the only witness who testified, and at the end of his direct examination both sides rested. His testimony was that, while he was employed by another corporation and when he had had no experience with respect to incinerator plants, he was interviewed by a Mr. Johnson in Chicago, who represented the defendant and who told him that, because of Freiberg's connections with various men

in Cincinnati and his acquaintance with the city government, he wanted to employ him as an agent to endeavor to sell an incinerator plant to the city. Freiberg testified that he accepted the employment as offered, and that his commission was to be 20 per cent. of the selling price, but that that by agreement was later reduced to 12 per cent. to enable the defendant to reduce the amount of its bid. He also testified as follows:

"Q. Will you tell the Court what your duties were, and what you did? A. I devoted my entire time to the work of the Superior Incinerator Company, I had to make contacts; I had to go to all the merchants who I thought might be possibly interested in the building of an incinerator in Cincinnati. I went to the presidents of various organizations with whom I was acquainted, and I merely said to them that I was interested and engaged by the Superior Incinerator Company and, everything being equal, I would like to have a fair chance at the bid for the Superior Incinerator Company.

"Q. At that time did the City of Cincinnati have an incinerator plant in operation? A. No, sir.

"Q. Was part of your duties the influencing of business men and city officials for the purpose of getting the City of Cincinnati to build incinerator plants? A. A plant, yes.

"Q. Was part of your duties the taking of various delegations of officials and business men to various plants of the defendant company, to show them the merits of your company's product? A. Yes, it was my duty not only to show them our plants, but opposition plants also, to show them the difference in the various plants, and show them the superiority of our plant over other plants.

"Q. And you did that, did you? A. Yes. * * *

"Q. And were your duties similar with respect to the proposed contract with the City of Fort Thomas, Kentucky, as you have testified with respect to the City of Cincinnati? A. Exactly the same."

 In deciding whether such contracts as these are contrary to public policy, the construction of no statute is involved, and courts of the United States treat the subject as one of general law. Liverpool & Great Western Steam Co. Ltd. v. Phenix Ins. Co., 129 U.S. 397, 9. S.Ct. 469, 32

L.Ed. 788; Black & White Taxicab & Transfer Co. v. B. & Y. Taxicab & Transfer Co., 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681, 57 A.L.R. 426.

 So far as actual proof goes, nothing corrupt or immoral was contemplated by the parties or done by Freiberg. He had had no experience in this business, but did have an acquaintance which would get him a hearing. at least. It was conceivably possible for him to try to advance his cause by bringing to bear upon the city officials influences, personal or otherwise, which had 'nothing to do with the merits of the proposition for installing an incinerator plant at all or with the quality of the defendant's incinerator. How far this possibility of the exertion of improper pressure, coupled with such indication of probability of its use as may be afforded by his acquaintance with people influential in city affairs and the necessity for success which followed from the contingency of his commission, goes to outlaw these contracts, must be decided with due regard for a clearly established policy to interfere with freedom of contract only when the reasons for so doing outweigh the public benefit such freedom in' general affords. Baltimore & Ohio Southwestern Railway Co. v. Voigt, 176 U.S. 498, 20 S.Ct. 385, 44 L.Ed. 560. And only when the paramount public interest requires it will a party who has received the benefit of the performance of a contract be permitted to say that the obligations he assumed are not binding because illegal. Steele v. Drummond, 275 U.S. 199, 48 S.Ct. 53, 54, 72 L.Ed. 238. Contracts which are against public policy are clearly unenforceable, but the term "public policy" is itself an indefinite and changeable thing. Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263; Steele v. Drummond, supra; Black & White Taxicab & Transfer Co. v. B. & Y. Taxicab & Transfer Co., supra.

From what was said in Providence Tool Co. v. Norris, 2 Wall. 45, 17 L.Ed. 868, it might be thought that contingency of compensation coupled with the possibility of using corrupt influence to procure a contract for the sale of supplies to the government was enough to condemn a contract without more, though in that case the use of personal and political influence under the contract held unenforceable was actually proved. In Stanton v. Embrey, 93 U.S. 548, 23 L.Ed. 983, it was shown that a

contract to procure favorable action on a claim against the government is not necessarily unenforceable because it provides for contingent compensation. Unless the contract otherwise has a sinister aspect, contingency of compensation is not enough to destroy its binding force.

In Oscanyan v. Winchester Repeating Arms Co., 103 U.S. 261, 26 L.Ed. 539, the plaintiff, the consul general of the Ottoman government at New York, was shown to have promised to use his personal influence to persuade the agent of his government to buy arms made by the defendant. The agreement was to pay Oscanyan 10 per cent. of all sales he could bring about, provided the prices were satisfactory to the defendant. The agreement had nothing to do with the merits of the goods sold, and clearly was an inducement to Oscanyan to try to persuade the agent to buy, regardless of quality, at as high prices as might be fixed, contrary to the duty the plaintiff owed the purchasing government he ostensibly served. That contract was held to be against public policy. And so was the one in Crocker v. United States, 240 U.S. 74, 36 S.Ct. 245, 247, 60 L.Ed. 533, where the company of which the plaintiff was the trustee in bankruptcy had employed one Lorenz on a contingent basis to aid it in securing a government contract for the supply of postman's satchels, and Lorenz had secretly agreed to split his commission with an officer of the company and an employee of the government. As stated in the opinion, "there was an obvious departure from recognized legal and moral standards." So, too, in Hayward v. Nordberg Mfg. Co. (C. C.A.) 85 F. 4, a contract was held to be against public policy where a former member of the city council was employed to sell a pump to the city of Grand Rapids and concealed the fact that he was so employed so that he might, and did, urge the purchase apparently as a public-spirited citizen interested only in advancing the public good. And in Hazelton v. Sheckels, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939, 6 Ann.Cas. 217, where the contract contemplated a sale of property to the plaintiff who was to procure legislation from Congress for its purchase by the government for use as a site for a hall of records at a price which would give the plaintiff the difference between what his contract with the defendant called for and the amount at which he could induce the government to buy, the bill for specific performance was dismissed on the ground that the contract was offensive to public policy. This was essentially a contingent contract to procure legislation, and contracts to obtain legislative favors on a contingent basis are clearly contrary to a public policy. Marshal v. Baltimore & O. R. Co., 16 How. 314, 14 L.Ed. 953; Noonan v. Gilbert, 63 App.D.C. 30, 68 F.(2d) 775.

The contracts in suit neither required Freiberg to do anything more than try to sell the incinerators on their merits nor did the proof show that he did more. While his acquaintance with people to be interviewed was one, and perhaps the most important, of the reasons for his employment, his work was to be, and was, but that of an ordinary salesman to demonstrate the worth of the defendant's product in comparison with that of other manufacturers of incinerators. There is nothing to show that he procured any contracts for the purchase of incinerators. The contracts for the purchase by the cities were let after public bidding. The defendant made the low bid in the sale to Cincinnati, but its bid on the Fort Thomas incinerator was next to the highest out of six. While that does suggest improper influence, it is but a bare suggestion, which is colorless in view of the fact that there is no proof whatever that acceptance of any of the lower bids would have better served the public interest of the city. As said in Steele v. Drummond, supra, "Detriment to the public interest will not be presumed, where nothing sinister or improper is done or contemplated." Citing, Valdes v. Larrinaga, 233 U.S. 705, 34 S.Ct. 750, 751, 58 L.Ed. 1163.

In the last-mentioned case there was present a possibility that the plaintiff, who agreed generally to aid the defendant, who had a concession to develop electric power on the River La Plata at El Salto in Porto Rico, would use improper influence with government officials, especially as he had formerly occupied an official position. He agreed, for a 10 per cent. share in the concession, to help the defendant "in the steps to be gone through and in everything in connection with said concession, such as plans, projects, and all what concerns to the technical part." What he was to provide were his "personal or professional services." Yet there was no proof of the use of personal or political influence, and the contract was upheld against the charge that it was contrary to public policy. So in J. E. Hanger, Inc., v.

Fitzsimmons, 50 App.D.C. 384, 273 F. 348, a contingent contract to sell artificial limbs to the Russian government was held valid where the services sold and rendered were but those of an avowed salesman in the usual way.

The prevailing rule to be gathered from the above cases is that contingent agreements to endeavor to make sales to a governmental body are not offensive to public policy because of the mere possibility that sinister or corrupt influence may be used in the performance. There must be proof that something contrary to good morals was contemplated or done. Otherwise the policy that permits parties to make lawful contracts and requires them to perform or answer in damages for their breach is the one that controls. That will not allow this defendant to take the benefit of these contracts without discharging the obligations it assumed under them. For decisions in state courts see Lewy v. Standard Plunger Elevator Co., 296 Ill. 295, 129 N.E. 775; Winpenny v. French, 18 Ohio St. 469; Lebus v. Dunlap, 80 S.W. 803, 26 Ky.Law Rep. 147.

Judgment reversed.