Robert B. TROUTMAN, Jr., Plaintiff-Appellee,

v.

SOUTHERN RAILWAY COMPANY, Defendant-Appellant.

No. 30625.

United States Court of Appeals, Fifth Circuit.

April 16, 1971.

Rehearing Denied and Rehearing En Banc Denied May 18, 1971.

Jones, Bird & Howell, F. M. Bird, Earle B. May, Jr., Trammell E. Vickery, Atlanta, Ga., Bloch, Hall, Hawkins & Owens, Charles J. Bloch, Ellsworth Hall, Jr., Macon, Ga., for defendant-appellant.

Robert L. Pennington, Allen E. Lockerman, Atlanta, Ga., for plaintiff-appellee; Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., of counsel.

Before WISDOM, Circuit Judge, DAVIS,* Judge, and GOLDBERG, Circuit Judge.

WISDOM, Circuit Judge:

Robert B. Troutman, Jr., a member of the State Bar of Georgia, brought this diversity action against the Southern Railway Company seeking to recover the sum of $200,000 as the reasonable value of legal services rendered to Southern in two separate matters—the Central of Georgia case [1] and the grain rate

---

* Judge Oscar H. Davis, United States Court of Claims, Washington, D. C. sitting by designation.

1. In 1962 Sim S. Wilbanks, representing Southern, came to Troutman's law office to ask him to help Southern with the Interstate Commerce Commission in connection with Southern's purchase of the Central of Georgia Railroad. After the successful completion of the matter, Troutman advised Wilbanks that South-

case—during the years 1962 and 1963. On Southern's motion for summary judgment, the district court ruled that Troutman's claim with respect to the Central of Georgia matter was barred by the Georgia four-year statute of limitations. Troutman v. Southern Ry. Co., N.D.Ga. 1968, 296 F.Supp. 963. Troutman took no appeal from that ruling, and the Central of Georgia matter has dropped out of the case. A jury awarded Troutman the sum of $175,000 as the reasonable value of his services in the grain rate case. We affirm.

## I.

In 1963 the Interstate Commerce Commission issued an order directing Southern to increase certain rates on grain shipments from the Midwest to the Southeast by approximately 16 percent. The order created a difficult situation for Southern: if allowed to stand, the order, according to Southern, would result in its losing a $13,000,000 investment in "Big John" railroad cars plus a "tremendous" loss of revenue in the future. Sim S. Wilbanks, a vice president and assistant to the president of Southern, turned for help to Troutman, who had only recently come to Southern's aid in the Central of Georgia case. Troutman, an Atlanta attorney, had no experience in I.C.C. matters, but he was known to Wilbanks as a personal friend and political ally of President John F. Kennedy. Wilbanks told Troutman that Southern was filing suit in a federal district court in Ohio to enjoin the order of the I.C.C. He asked Troutman to persuade the President and the Department of Justice, then headed by the President's brother, Robert F. Kennedy, to "ditch" the I.C.C. and enter the case on the side of Southern. What Wilbanks actually told Troutman, what he en-

gaged Troutman to do, and what Troutman eventually did are of course the crucial issues in this case, and we shall deal with them later in this opinion. Troutman's efforts were successful: the Department of Justice filed an answer in the Ohio lawsuit opposing the I.C.C. and supporting Southern's position. As a result of the Ohio litigation (in which Troutman played no further part), the I.C.C. order was struck down. In return for Troutman's services (in connection with the Central of Georgia case as well as the grain rate case), Southern agreed to look into the joint development of air rights that Troutman owned on property in downtown Atlanta adjacent to property owned by Southern. Efforts to work out the joint development of the air rights continued for several years. When it became apparent, however, that Southern would not join in the development of the air rights, Troutman demanded compensation for his services in the grain rate case in "the usual manner"—i. e., by the payment of money. When Southern refused to pay, Troutman filed suit.

Southern defended the action on three grounds: (1) that Troutman's claim was barred by the Georgia four-year statute of limitations; (2) that Troutman's activities on behalf of Southern were not legal services and were gratuitously rendered; and (3) that because of the nature of the services rendered, it would be contrary to public policy to enforce a claim for compensation. On these grounds Southern moved for the entry of summary judgment in its favor. The district court denied the Motion, Troutman v. Southern Ry. Co., N.D.Ga.1968, 296 F.Supp. 963, and a jury returned a verdict for Troutman in the amount of $175,000. The court denied Southern's motion for judgment notwithstanding

ern could settle its obligations to him by joining with Troutman to develop certain air rights. The air rights owned by Troutman adjoined property owned by Southern and the Central of Georgia in Atlanta; in Troutman's opinion a joint development of these air rights would

have been mutually profitable to both parties. Negotiations over the air rights were still pending when Wilbanks again approached Troutman to seek his aid on behalf of Southern, this time in the grain rate case.

the verdict or for a new trial, and Southern appealed.

## II.

Southern's first contention is that the district court erred in refusing to grant Southern's motion for judgment notwithstanding the verdict because the evidence conclusively establishes that the contract upon which Troutman sued was "to exert his personal and political influence upon the President of the United States." Southern argues that such a contract is in violation of public policy and unenforceable; therefore, the court erred as a matter of law in failing to render judgment for Southern. We cannot agree.

▮▮▮▮▮ It is of course true that a contract to influence a public official in the exercise of his duties is illegal and unenforceable when that contract contemplates the use of personal or political influence rather than an appeal to the judgment of the official on the merits of the case. *See, e. g.*, Oscanyan v. Winchester Repeating Arms Co., 1881, 103 U.S. 261, 26 L.Ed. 539; Providence Tool Co. v. Norris, 1865, 69 U.S. 45, 2 Wall. 45, 17 L.Ed., 868; Annot., 148 A. L.R. 768; Annot. 46 A.L.R. 196. Nevertheless, all citizens possess the right to petition the government for redress of their grievances. United States Constitution, Amendment I. To that end, one may employ an agent or attorney to use his influence to gain access to a public official. Moreover, once having obtained an audience, the attorney may fairly present to the official the merits of his client's case and urge the official's support for that position. *E. g.*, Hall v. Anderson, 1943, 18 Wash.2d 625, 140 P.2d 266, 148 A.L.R. 760; Old Dominion Transportation Co. v. Hamilton, 1926, 146 Va. 594, 131 S.E. 850, 46 A. L.R. 186. As the district court well stated in its opinion overruling Southern's motion for summary judgment, it is "only the elements of 'personal influence' and 'sinister means' [that] will void the contract and deny it enforcement." Troutman v. Southern Ry. Co., N.D.Ga.

1968, 296 F.Supp. 963, 972. *See also* Coyne v. Superior Incinerator Co., 2 Cir. 1936, 80 F.2d 844; Meadow v. Bird, 22 Ga. 246; Cary v. Neel, 54 Ga.App. 860, 189 S.E. 575. Moreover, the illegal or sinister nature of a contract for professional services will not be presumed; the burden of proving the illegality of the contract is clearly upon the party asserting it. Steele v. Drummond, 1927, 275 U.S. 199, 48 S.Ct. 53, 72 L.Ed. 238; 17A C.J.S. Contracts § 585.

It necessarily follows then that the decision whether to enforce a claim for compensation for these kinds of legal services will depend largely upon the facts of each case. *See* Noble v. Mead-Morrison Mfg. Co., 1921, 237 Mass. 5, 129 N.E. 669; 17 Am.Jur.2d Contracts § 211. Whether the parties in fact entered into a contract calling for the improper exercise of personal influence upon a public official is therefore a question for the jury, guided of course by proper instructions. Old Dominion Transportation Co. v. Hamilton, 1926, 146 Va. 594, 131 S.E. 850, 46 A.L.R. 186; *cf.* 3 A. Corbin, Contracts §§ 534, 554. In this case the jury concluded that Troutman had agreed with Southern to use his influence merely to gain access to the President and present to him the merits of Southern's case; therefore, the contract was valid and enforceable. On appeal from the order of the district court denying Southern's motion for judgment notwithstanding the verdict, it is our task to examine the record to see whether substantial evidence supports the jury's conclusion. *See* Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374–375 (en banc).

Troutman himself testified that Wilbanks asked him to go to the President and persuade him "to listen to the case and to see if [the I.C.C.'s order] was not truly against the national interest of this country." He testified that Wilbanks did not ask him to use personal or political influence to get the President to do something for that reason alone. Because he was convinced of the merit of Southern's position, Troutman

went to Washington and talked with the President, the President's Special Deputy Counsel Myer Feldman, Assistant Attorney General William H. Orrick, Jr., and officials in the Department of Agriculture.

Feldman testified by deposition that upon being advised of the grain rate problem the President asked him to look into it and "to report back to him on the merits of the case." He said that Troutman supplied him with material helpful to an understanding of the issues and that their conversations dealt with what was in the best interest of the nation, the South, and the farm community. After carefully studying the matter, Feldman reported to the President that he thought that the I.C.C.'s order would adversely affect the economy of the South and therefore was not in the national interest. Finally, Feldman testified that Troutman did not make any request of the President that Feldman considered in any way improper; he did not consider it improper to bring the grain rate case to the attention of the President.

Orrick testified, also by deposition, that he and his staff studied the legal questions and that the decision of the Department of Justice to file an answer in the Ohio court contrary to the position of the I.C.C. was based entirely on the merits of the case, unaffected by any outside influence. He also stated that it was not unusual for an attorney to call upon him for the purpose of presenting to him, as an Assistant Attorney General, the contentions, both legal and economic, of the attorney's client; and such activities come within the general scope of the performance of legal services for the client.

 From this evidence we conclude that a jury could reasonably find that Troutman was employed to use his influence, such as it was, merely to obtain an audience with the President and there to present to him the merits of Southern's position. Such an employment contract is not in violation of public policy and is therefore enforceable. It follows then that the district court did not err in refusing to grant Southern's motion for judgment notwithstanding the verdict.

## III.

Second, Southern contends that the court erred in admitting as rebuttal evidence Southern's answers to certain interrogatories concerning its employment in the grain rate case of former Georgia Governor S. Ernest Vandiver. This contention is also without merit.

 The admission of rebuttal evidence is within the discretion of the district court. The Vandiver interrogatories showed that Southern had paid Vandiver for services in the grain rate case similar to those Troutman had rendered and that on its checks to Vandiver it had characterized those services as "legal services." Troutman, properly enough, sought to introduce the interrogatories to rebut Southern's argument that Troutman's activities on its behalf were not legal services and were rendered gratuitously. Moreover, they were useful in impeaching the testimony of the witness Wilbanks, who had answered evasively concerning Southern's relationship with Vandiver. In these circumstances we cannot say that the district court abused its discretion by admitting the interrogatories into evidence.

## IV.

 Southern's third argument is that in several particulars the court's instructions to the jury concerning contracts in violation of public policy were erroneous. In reviewing the trial court's instructions to the jury, we must consider the charge as a whole, in connection with the contentions made by the parties in the trial court, and from the standpoint of the jury. If the charge in general correctly instructs, then even though a portion is technically imperfect, no harmful error is committed. Webster v. Sea Drilling Corp., 5 Cir. 1969, 411 F.2d 411, 413; Grey v. First National Bank, 5 Cir. 1968, 393 F.2d 371, 381; Garrett v. Campbell, 5 Cir. 1966, 360 F.2d 382, 386. Consid-

ered as a whole, the court's instructions, set out in the margin,[2] correctly state the law concerning contracts in violation of the public policy.

2. The relevant portion of the court's charge reads as follows:

In this regard, I charge you that contracts contrary to public policy, that is, those which tend to be injurious to the public or against the public good, are illegal and void, even though actual injury does not result therefrom. In this category, and purely by way of illustration, such a contract which would violate public policy would be, for instance, a contract to buy legislation or to obstruct justice, or to tamper with a jury, or to bribe a judge. Such a contract would be utterly void and would not be enforced by the courts, and will not be enforced by the courts, either directly or indirectly.

Now the law does not attempt to categorically or exhaustively define the phrase "contrary to public policy," or to specify with particularity every type of contract which does or does not fall within this prohibition. Many contracts affecting the public are clearly valid. Some are clearly void. Still others may or may not be, depending upon the circumstances. Among those falling within the latter group, the law lays down no arbitrary rule, but wisely leaves it to the jury to decide the validity of the particular contract under the facts of each case.

I charge you, however, that there are certain well defined principles which a jury should consider in arriving at its conclusion as to whether a particular contract is or is not void for this reason. In each case, for example, the test for any, for any contract, as to whether it is or not against public policy, must be measured by its inherent tendencies, and if those tendencies be bad, the legality of the contract cannot be saved merely by the good faith of the contracting parties.

Nor does it matter whether efforts to carry out such a void contract have met with success or failure, or whether any evil in fact resulted by or through the agreement.

Now, in order to render a contract void as contrary to public policy, there must be some attendant sinister suggestion that goes to the very heart of the undertaking. Thus, a mere incidental or collateral act of illegality in performing under a contract will not render an otherwise valid and lawful contract unlawful, but if both the innocent and the corrupt aspects of the agreement, or the performance thereunder, be so hopelessly intertwined as to taint the entire contract or stain the en-

## V.

Southern's final contention is that the district court erred in refusing

tire fabric, then the whole contract must fall.

I charge, you also that in every case, Ladies and Gentlemen, the invalidity of a contract as violating public policy must be proved, and detriment to the public will never be presumed where nothing sinister or improper is done or contemplated. Thus, if a contract be one which by its terms can be performed in a lawful manner, the presumption is that it will be so performed, at least until the contrary appears. But even so, if a subsequent performance or attempted performance under the contract should itself involve conduct clearly contrary to public policy, then the person suing to enforce the contract may still be denied a recovery thereunder.

In the final analysis, Ladies and Gentlemen, if a contract is to be held to violate public policy, it is the illegality of the conduct of the person seeking to enforce the contract, either in entering into the agreement in the first place, or in performing it thereafter, which is the true ground, if any, for denying recovery.

It will be your duty, Ladies and Gentlemen, to apply these principles to the facts of this case as shown by the evidence. In this regard, I charge you that contracts to influence public officers in the performance of their duties may or may not be contrary to the public policy, depending first on what was contracted to be done, and second, on what actually was done in furtherance of such an agreement. Thus, one may contract to use his personal connections or influence merely to gain access to a public official, or to obtain an audience with him, and such contract is clearly legal and permissible. Otherwise, many perfectly innocent citizens would be deprived of an opportunity to have the merits of their case considered.

Moreover, having gained an audience with a public official, one may agree, for hire, to urge the support of such public official for a, in favor of a certain position by furnishing to him facts or law or even theories, provided always that in the final analysis such facts or laws or theories are presented and are to be presented on their merits, and only for what they may be worth.

I charge you, Ladies and Gentlemen, that on the other hand, it is illegal to contract to influence the conduct of a public official on any other basis. Speci-

to grant its motion for a new trial on the ground that the jury verdict was excessive. In Baker v. Dillon, 5 Cir. 1968, 389 F.2d 57, this Court said,

> It is a well-established rule of this Court that the granting or denial of a new trial on the ground of excessive or inadequate damages is a matter of discretion with the trial court, not subject to review except for grave abuse of discretion.

*Id.* at 58. In the circumstances of this case the court did not abuse its discretion by denying Southern's motion for a new trial. The jury's verdict is supported by the evidence.

Therefore, the judgment of the district court is affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

fically, Ladies and Gentlemen, I charge you that it is illegal to agree for hire to bring personal or political influence to bear on a public official, and to seek action or a decision from him on the basis thereof, when it's done irrespective of

and without regard to the merits of the case. Such an agreement, Ladies and Gentlemen, would be patently in violation of public policy and would be absolutely void and unenforceable.