## Richmond.

## OLD DOMINION TRANSPORTATION COMPANY v. NORMAN R. HAMILTON.

### February 25, 1926.

1. MASTER AND SERVANT—*Agency—Action for Services—Instruction Held Erroneous as Over-Emphasizing Importance of Results—Case at Bar.*— In an action for services rendered to a transportation company by plaintiff in obtaining pier facilities, instructions that in ariving at their verdict the jury might consider among other things "the importance to the defendant at this time of obtaining pier facilities. in New York" was held erroneous, as over-emphasizing the importance of the results to the principal rather than the importance of the transaction itself.

2. AGENCY—*Action by Agent for Compensation—Measure of Damages.*—The measure of damages in an action for services by an attorney or agent is the reasonable value of the services rendered, not in benefit to the client but in themselves on a *quantum meruit;* and the circumstances to be considered in determining the compensation to be recovered are—the amount and character of the service rendered;. the responsibility imposed; the labor, time and trouble involved; the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected; the professional skill and experience called for; the character and standing in his profession of the agent or attorney; and whether or not the fee is absolute or contingent. The results secured by the services of the agent or attorney may likewise be considered.

3. ILLEGAL CONTRACTS—*Personal and Political Influence.*—Personal and political influence is not a vendable article and an action for compensation for their use by a plaintiff on behalf of a defendant will not lie.

4. INSTRUCTIONS—*Instruction to be Read in Connection with the Evidence.*— Every instruction must be read in connection with the evidence in. the case.

5. ILLEGAL CONTRACTS—*Presumption that Contract is Legal—Case at Bar.*—In the instant case plaintiff sued for his services in procuring pier facilities for defendant, a transportation company. There was nothing upon the face of the agreement between plaintiff and defend-

ant which made it unlawful, and the fact that plaintiff's fee was contingent brought about no such result. The presumption therefore was that the transaction was lawful. An intention to violate law or morals is npt to be presumed.

6. ILLEGAL CONTRACTS—*Misconduct in Carrying Out Lawful Contract.*—A legal contract will not be made illegal by misconduct on the part of the plaintiff in carrying it out.

7. ILLEGAL CONTRACTS—*Agency—Attorney and Client—Contract that Can be Performed Lawfully.*—In contracts between attorneys and clients, and principals and agents, the usual test would seem to apply that if a contract can, by its terms, be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while, on the other hand, a contract entered into with intent to violate the law is illegal, even if the parties may, in performing it, depart from the contract and keep within the law.

8. ILLEGAL CONTRACTS—*Services Rendered—Fraudulent Devices—Violation of Public Policy.*—On principle there should be no recovery in cases where fraudulent devices were adopted or where public policy is plainly violated. The reasons which lead to this conclusion are more compelling when the action is for services rendered and not on a contract performed.

9. ILLEGAL CONTRACTS—*Action for Services Rendered.*—It is the illegality of plaintiff's conduct, not the nature of the transaction, that prevents a recovery in an action for services rendered.

10. ILLEGAL CONTRACTS—*Test of Enforceability of Transaction.*—The test, whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal transaction to establish his case. If a plaintiff cannot open his case without showing that he has broken the law, a court will not assist him, whatever his claims, in justice, may be upon the defendant; and if the illegality be *malum prohibitum* only, the plaintiff may recover, unless it be directly on the forbidden contract.

11. ILLEGAL CONTRACT—*Incidental Acts of Illegality.*—Incidental acts of illegality do not render a lawful contract unlawful. There must be some attendant sinister suggestion that goes to the heart of the case.

12. ILLEGAL CONTRACTS—*Action for Compensation for Securing Pier Facilities—Procuring Letter to Prominent Politician—Case at Bar.*—In the instant case, an action by plaintiff for services rendered in securing pier facilities in New York for defendant, a transportation company, it appeared that plaintiff went to New York armed with letters to prominent politicians and employed to assist him a prominent New York lawyer and politician of national repute.

*Held:* That this was not illegal.

13. ILLEGAL CONTRACTS—*Action for Compensation for Securing Pier Facilities—Obtaining Influence of Newspapers.*—In the instant case, an

action by plaintiff for services rendered in securing pier facilities in New York for defendant, a transportation company, it appeared that plaintiff went to New York and sought and gained the influence of some of the New York papers and secured the publication of arguments to the effect that the city of New York was interested in the continuance of defendant as a going concern.

*Held:* That there was nothing improper in laying the facts before the public.

14. Evidence—*Appeal and Error.*—In considering evidence excerpts should not be relied upon disassociated from their settings.

15. Illegal Contracts—*Agency—Action for Services in Obtaining Pier Facilities for a Transportation Company—Legality of Transaction for the Jury—Case at Bar.*—The instant case was an action by plaintiff against defendant, a transportation company, for services rendered in obtaining pier facilities for defendant in New York City. Plaintiff admitted that in securing these facilities he used every influence possible in good conscience to gain access to the city authorities who had power to pass upon his case.

*Held:* That it was for the jury to say upon the evidence whether policital influences beyond such as were necessary and lawful were brought to bear when the matter was up for decision. If so there could be no recovery. But if plaintiff presented his case upon its merits he was entitled to be paid for his services.

16. Questions of Law and Fact—*Questions for the Jury.*—Issues raised by more than a scintilla of evidence must be decided by the jury.

17. Illegal Contracts—*Action by Agent for Services Rendered—Instruction to Find for Defendant if Plaintiff Used Political Influence—Case at Bar.*—The instant case was an action by plaintiff for services rendered defendant, a transportation company, in securing pier facilities in New York City. The court refused to instruct the jury that if they believed from the evidence that the plaintiff used his personal and political influence to secure the facilities at a lower rental than could have been secured by an ordinary business man, they should find for defendant.

*Held:* That this instruction was too unqualified a statement of the law to be warranted by the evidence. It should have been modified by a statement of the character of the influences which would vitiate a contract or a recovery upon a *quantum meruit* and so modified it should have been given.

18. Illegal Contracts—*Contract to Secure Pier Facilities from the City of New York—Burden of Proof—Case at Bar.*—The instant case was an action by plaintiff against defendant for his services in securing pier facilities for defendant in the city of New York. The contract between plaintiff and defendant was not against public policy nor illegal on its face, and the burden of showing it to be against public policy or illegal was upon defendant, unless either of these infirmities appeared from plaintiff's own testimony.

19. ILLEGAL CONTRACTS—*Contract to Secure Pier Facilities from the City of New York—Instructions—Case at Bar.*—The instant case was an action by plaintiff against defendant for his services in securing pier facilities for defendant in the city of New York. The jury should have been told that if they believed from the evidence that either personal or political influences were brought to bear, and that the city authorities were asked to decide the controversy in favor of the transportation company for personal or political reasons, there could be no recovery. But if the personal or political influences were exerted merely to secure a hearing from the city authorities and when the hearing was secured the case was presented upon its merits then the jury should have been told that the plaintiff was entitled to recover.

Error to a judgment of the Circuit Court of the city of Norfolk, upon a motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed and remanded.*

The opinion states the case.

*Henry Bowden* and *Venable Miller, Pilcher & Parsons,* for the plaintiff in error.

*Savage & Lawrence* and *Willcox, Cooke & Willcox,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is a motion for judgment founded upon services rendered and accepted. Plaintiff recovered a verdict for $10,000.00. It was confirmed by the court and to it a writ of error has been awarded.

Prior to 1921, the Old Dominion Steamship Company (hereafter called steamship company) in addition to other ventures owned and operated a coast-wise line of steamships trading between Norfolk and New York. It, for satisfactory reasons, decided to go out of this

coast-wise business and sold the steamships thus engaged to the Old Dominion Transportation Company (hereafter called transportation company). At the time of this purchase the steamship company leased to the transportation company one-half of pier 26 at New York. It paid to that city for that pier $56,000.00 a year rent. Its subleasee agreed to pay for one-half of it $73,000.00 a year rent.

This sublease expired by limitation on July 31, 1921.

In the latter part of 1920, friction developed between these companies. The steamship company harassed and impeded the transportation company in the conduct of its business on the pier, and in many ways impaired the usefulness of its terminal facility. Indeed, it appeared entirely probable that the sublease which expired on July 31, 1921, would not be renewed and that after that time the transportation company would be left without any dock at all in the port of New York. Its very existence was threatened. The transportation company acting through its president was not able to reach agreement with the steamship company. It was ascertained, however, that the lease of the steamship company might be cancelled by the city in the event of a sublease made without its consent. In these circumstances the transportation company sought the services of Mr. Hamilton, a gentleman of character and prominence, and entered into a contract with him under which he was to go to New York and induce the city, if possible, to cancel the lease of the steamship company to the end that the transportation company might take over the entire pier. There were no provisions made in the contract as to the methods to be adopted by him in effecting this result. He was given power to do those things necessary and, in a general way, to protect the transportation company's interests.

Mr. Hamilton, acting under his contract, went to New York a number of times and did succeed in having the original lease cancelled. That act of the city government of New York was held up by court proceeding. The net result of his activities was that the transportation company continued to use its one-half of pier 26 until December, 1921. He also secured for it pier 31 and succeeded in having the rent reduced from $45,-000.00 to $30,000.00 a year.

For these services he charged a fee of $20,000.00 and was paid $2,000.00 thereon. Payment of the balance of $18,000.00 was refused and this action instituted, terminating, as we have seen, in a judgment for him in the sum of $10,000.00.

The plaintiff asked for one instruction which was given. That instruction is as follows:

"The court instructs the jury that if they believe from the evidence that the plaintiff was employed by the defendant as claimed by him, and that he performed the services for which he was employed, and if they further believe from the evidence that the amount which was to be paid the plaintiff by the defendant was not agreed on in advance and has never been agreed on, then, if they find for the plaintiff, they should fix the amount of his damages at what they think, under all of the facts and circumstances disclosed by the evidence, the plaintiff is reasonably entitled to receive for the services rendered, in addition to the amount which he has already been paid, if they shall believe he is entitled to recover any additional amount; and in arriving at this amount they should consider, among other things, the importance to the defendant at the time of obtaining pier facilities in New York; the amount of the money or the value of the property to be affected; the amount and character of the services rendered, and the

diligence, skill and effectiveness of the service which was rendered by the plaintiff."

This is the basis of the first assignment of error.

[1] The error charged is that it tells the jury they should consider in arriving at their verdict among other things "the importance to the defendant at this time of obtaining pier facilities in New York;" that it makes the measure of the services rendered depend upon the necessities of the defendant and the value of such services to him and not upon the reasonable value of services in themselves.

[2] The elements to be considered in a recovery of this character are stated by Judge Sims in *County of Campbell* v. *Howard*, 133 Va. 19, 112 S. E. 876:

"It is the reasonable value of the services rendered, not in benefit to the client, but in themselves on a *quantum meruit;* and that the circumstances to be considered in determining the compensation to be recovered are—the amounts and character of the services rendered; the responsiblility imposed; the labor, time and trouble involved; the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee where it is to be contingent than where it is not so. The result secured by the services of the attorney may likewise be considered; but merely as bearing upon the consideration of the efficiency with which they were rendered, and, in that way, upon their value on a *quantum meruit,* not from the standpoint of their value to the client."

It must be conceded that this instruction emphasizes

the importance of the results to the client rather than the importance of the transaction in itself.

The value of services to the defendant measured by its necessities is not necessarily the measure of the value of the services in themselves. All that a man hath will he give for his life but counsel who successfully defends a millionaire client charged with murder cannot take his entire estate. In such a case the value of services to the client is not the measure of the recovery. If he were to collect for this same client a simple account, the value of the services and their value to the client would probably be the same and the value of the services to him might well be the measure of the recovery.

Since for other reasons this case must be remanded for a new trial, this instruction should be reformed to conform more closely with the distinction drawn by Judge Sims in the *Campbell County Case.*

The second assignment of error is based upon the action of the court in refusing to give instruction No. 3 for the defendant:

"The court instructs the jury that neither personal nor political influence is a vendible article in our system of laws and morals, and if you believe from the evidence that the plaintiff used his personal and political influence to secure from the officers of the city of New York the use of pier 26 for the defendant or to secure a lower rental of pier 31 for the defendant than could have been secured by an ordinary business man without any special personal or political influence, then the courts of this Commonwealth will not assist him in securing compensation for such services and your verdict should be for the defendant."

The last assignment is to the action of the trial court in refusing to set aside the verdict of the jury. These

two assignments are so interwoven that they will be dealt with as one.

To understand them, it is necessary to state the facts which these litigants claim are established by the evidence. We do this briefly. For the defendant it is said that Hamilton was collector of the port at Norfolk appointed by Mr. McAdoo at a salary of $5,000.00 a year; that he secured through political influence a furlough from his official duties; that he went to Washington and obtained letters of introduction from prominent politicians there to politicians in New York, Mr. Hearst included; that he secured the publication of propaganda in newspapers in that city; interested himself in the re-election of Mayor Hylan; retained Mr. McAdoo as counsel, and in every way sought to exercise on the powers that were personal and political influence.

For the plaintiff it is said that he was a man of intelligence, wide awake and resourceful and was for that reason retained; that the existence of the transportation company was at stake and large public and private interests involved; that he armed himself with such letters of introduction as were calculated to procure for him a hearing, and that all that was done in New York was for the purpose of securing such a hearing, of gaining access to those with whom final judgment rested, and that when such access was finally secured he presented his case upon its merits and upon its merits alone.

[3, 4] This instruction No. 3 is undoubtedly a correct statement of a general principle, but like every instruction it must be read in connection with the evidence in the case. A witness must tell, not only the truth, but the whole truth. Neither personal nor political influence is a vendible article. How does this proposition apply to the case in judgment and what is

there illegal about Hamilton's conduct? What was the character of this contract and was it invalid on its face?

In *Smyth Bros.* v. *Beresford*, 128 Va. 137, 104 S. E. 371, the following authorities are quoted with approval:

"An intention to violate law or morals is not to be presumed. *Bergen* v. *Frisbie*, 125 Cal. 168, 57 Pac. 784.

"The law does not presume that parties to a contract intended by it to accomplish an illegal object, but it rather presumes that they intended to accomplish a legal purpose." Elliott on Contracts, section 1065.

"The law will not presume, unless it is forced to do so, that a person intends to do an illegal act. It will not therefore presume that the parties intended to make an illegal contract." *Richards* v. *Weiner Co.*, 207 N. Y. 59, 100 N. E. 592, affirming 145 App. Div. 363, 129 N. Y. Supp. 951.

"As tending to indicate the immorality of a contract the contingent character of the fee works no such result." *Bergen* v. *Frisbie, supra*, 125 Cal. page 786, 57 Pac. 784.

"In view of these citations, affording the appropriate rule of interpretation for an instrument sought to be impressed with the implication of an unlawful purpose, the language of the plaintiff's letter, cited *supra*, was properly construed to express an innocent intent.

"As was said in *Brightman* v. *Bates, supra* [55 N. E. 809, 175 Mass. 105], the question before us is not whether or not it would be possible to carry out the contract in a way which would have made the contract bad, if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance. *Carnagie* v. *Security Trust Co.*, 111 Va. 1, 68 S. E. 412, 31 L. R. A. (N. S.) 1185, 21 Ann. Cas. 1287."

[5] We therefore start out with the clear assumption

that the transaction in judgment was lawful. There was nothing upon its face which made it unlawful and the fact that the fee was contingent brought about no such result.

In *Stansell* v. *Roach*, 147 Tenn. 183, 246 S. W. 520, 29 A. L. R. 143, an instructive case, the court said:

"It is said by counsel for the defendant that the case just referred to is one of the recognized cases of pure professional services. That is unquestionably true, but this and the other similar cases emphasize the rule that contingency in the compensation for services contained in an agreement does not of itself vitiate the contract nor does it necessarily involve the implication of undue influence. *Wright* v. *Tebbitts*, 91 U. S. 252, 23 L. Ed. 320; *Stanton* v. *Embry*, 93 U. S. 548, 23 L. Ed. 983; *Taylor* v. *Bemiss*, 110 U. S. 42, 28 L. Ed. 64, 5 Sup. Ct. Rep. 441. The reason for upholding the validity of such contracts was stated by Mr. Justice Miller in the case just cited. He said: 'The well known difficulties and delays in obtaining payment of just claims which are not within the ordinary course of procedure of the auditing officers of the government justify a liberal compensation in successful cases, where none is to be received in case of failure. Any other rule would work much hardship in cases of creditors of small means residing far from the seat of government who can give neither money nor personal attention to securing their rights.' " See also *Nutt* v. *Knut*, 200 U. S. 13, 26 S. Ct. 216, 50 L. Ed. 348.

[6] Many cases hold that a legal contract will not be made illegal by misconduct on the part of the plaintiff in carrying it out.

In *Stansell* v. *Roach, supra*, the court said:

"This contract is to be decided not by what unlawful means may have been used to bring about a just and

honest result, but whether by its terms it necessarily implies the use of unlawful means in its accomplishment."

Page on Contracts, vol. 2, section 663, says:

"The illegality or validity of a contract is to be ·determined by its tendency as the parties make it, and not by its actual results as the parties perform it. If it can, by its terms, be performed lawfully, it will be treated as legal, even if it is actually performed in an illegal manner, or even if one of the parties intends illegal performance; and still more, if illegal performance is merely possible."

[7] 2. R. C. L. 1041 states the law to be:

"In contracts , between attorneys and clients the usual test would seem to apply that if a contract can, by its terms, be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while, on the other hand, a contract entered into with intent to violate the law is illegal, even if the parties may, in performing it, depart from the contract and keep within the law."

In *Barry* v. *Capen*, 151 Mass. 99, 23 N. E. 735, ·6 L. R. A. 808, Holmes, J., said:

"If the contract was legal, it would not be made illegal by misconduct on the part of the plaintiff in ·carrying it out. *Howden* v. *Simpson*, 10 Ad. & El. 793, 818, 819, 2 Perry & Day, 714, 749; *Simpson* v. *Howden*, 9 Clark & F. 61, 68; Barrett J., in *Powers* v. *Skinner*, 34 Vt. 274, 284, 285 [80 Am. Dec. 667]."

See also *Bush* v. *Russell*, 180 Ala. 591, 61 So. 373; *Hogston* v. *Bell*, 185 Ind. 536, 112 N. E. 883; and *Armour* v. *Jesmer*, 76 Wash. 475, 136 Pac. 689.

On the other hand Prof. Williston in his work on ·contracts, section 1761, says:

"It has been said that 'there is no policy· of law

against the plaintiff's recovery unless his contract was illegal, and a contract is not necessarily illegal because it is carried out in an illegal way.' It is submitted that if this statement is made as a general principle it is unsound. The illegality of the plaintiff in relation to the contract is the vital test, not merely the character of the contract. It is true that not every illegal act in performing a contract will vitiate recovery; thus if a carpenter in building a legal fence commits a trespass, this will not preclude recovery for the fence; but if the performance rendered by the plaintiff is something in itself forbidden by law to be rendered the fact that the contract was in such general terms as to cover either such illegal performance or a lawful performance, and that both parties originally had no intention to have the performance unlawful, will surely not justify a recovery on the contract for the price of the unlawful performance. An agent can recover no commissions for negotiating a contract or sale by illegal means, though his contract with his principal did not specify the means to be employed, and his case would not be helped by proving that the principal or that both the principal and he himself originally expected legal means only would be employed. It would be a novel public policy which would deny recovery against a wrong doing principal where both parties had an evil intent, and would allow recovery against an innocent principal when the plaintiff is equally guilty in both cases. Not the illegality of the contract, but the illegality of the plaintiff's conduct either in entering into or in performing the contract is the true ground denying recovery." See also section 1630.

In the main cases cited in support of this view of the law are those in which the contract itself was

illegal. The leading case on that subject is *Oscanyan* v. *Winchester Repeating Arms Co.*, 103 U. S. (13 Otto) 261, 26 L. Ed. 539.

[8, 9] On principle we are of opinion that there should be no recovery in cases where fraudulent devices were adopted or where public policy is plainly violated. The reasons which lead to this conclusion are more compelling when the action is for services rendered and not on a contract performed. *Barry* v. *Capen, supra.*

It is clear that one cannot come into court and say: "I have done an evil thing for you, pay me for it;" but this distinction in the instant case is not of first importance. Plaintiff's motion is a simple statement that on a certain day he will move the court for judgment in a certain sum. An account seems to have been attached but it is not copied into the record. The evidence shows this motion to be based upon contract. All left open was the sum to be paid for the contract work. Had that been stated and had this been an action on that express contract, still no recovery could be had should it appear that corrupt devices had been adopted or public policy plainly violated. It is ''the illegality of plaintiff's conduct, not the nature of the transaction,'' that prevents a recovery. Williston on Contracts, section 1630. Upon this same evidence the same results follow if this motion be treated as an action on *quantum meruit.* In each instance it is "the illegality of plaintiff's conduct" that prevents a recovery. We must look to the character of the service rather than to the form of action.

A statement of the law sound in principle and measurably calculated to reconcile the apparent conflict of authority heretofore noted is contained in

*Swan* v. *Scott*, 11 Serg. & R. (Pa.) 155, where it is said:

[10] "The test, whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires the aid of the illegal transaction to establish his case. If a plaintiff cannot open his case without showing that he has broken the law, a court will not assist him, whatever his claims, in justice, may be upon the defendant; and if the illegality be *malum prohibitum* only, the plaintiff may recover, unless it be directly on the forbidden contract."

Hamilton's conduct is not charged to have been corrupt, but it is said that it does violate public policy. Public policy can no more be accurately defined than can due process of law. As Sir James Burroughs wisely observed it is "a very unruly horse."

[11] An agent to sell a farm at a given price cannot afterwards become the agent of the purchaser as well, and if he does so and fails to bring this to the attention of his original employer he cannot recover on his contract. For a stronger reason such an agent could not recover for services performed if he induced his principal to take less than the sum originally agreed upon, however innocent he may have been of double-dealing in the beginning and however free from taint his original contract may have been. It is equally clear, and the authorities which we have cited sustain the proposition, that incidental acts of illegality do not render a lawful contract unlawful. There must be some attendant sinister suggestion that goes to the heart of the case.

Influence may be good or evil: "To 'lobby' with department officials for a contract, as alleged in these pleas, does not necessarily imply corruption, but it

carries nevertheless a certain commonly understood suggestion of sinister purpose. It does imply a form of personal solicitation which tends to corruption, and is for that reason forbidden. But 'influence' is a much broader term. Standing alone, its moral and ethical implications are indifferent. They may be good or bad. The methods of influence may be legitimate or illegitimate. To say, then, that plaintiff promised 'to influence' the officers of the government, without more, meant nothing. An intention to violate law or morals is not to be presumed." *Bush* v. *Russell*, 180 Ala. 590, 61 So. 373.

In *Barry* v. *Capen, supra,* the plaintiff was chairman of the democratic city committee and appeared frequently before the street commissioners of his town. There the political influence was, of course, incidental and a recovery was sustained. In *Stansell* v. *Roach, supra,* Stansell in company with his client first went to Washington and laid his claim before Senator McKeller, whose constituents they were, and sought his assistance. Of course they went to see Senator McKeller because he was a man of political influence. There was no one else for them to see. Congress does not hold court and unless a claim is laid before some individual member of that body, or before its committees, a petitioner cannot be heard at all and so such a resort to personal and political influence is not unlawful. It only becomes unlawful when in its last analysis that influence rather then the merits of the case is relied upon for a recovery.

[12] Coming back to the case in judgment the inquiry necessarily arises: What particular illegal thing did Hamilton do?

It is said that before he went to New York he armed himself with letters of introduction to prom-

inent politicians. In order for him to gain access to the dock commissioner, to the corporation counsel and finally to the mayor of New York himself in whom was vested ultimate authority, it was necessary that he be properly vouched for and nothing is more natural than that he should have gone to men of prominence to secure their aid in this. Without such introduction by men of standing he would no more have had a chance to present his case to the mayor of New York City then he would have had to secure an audience with the Dalai Lamm.

It is said that in his extremity he associated Mr. McAdoo with him. Mr. McAdoo was a lawyer of prominence in New York City and came near being the candidate of the democratic party in our last presidential campaign. Surely this was not illegal. It cannot be that this gentleman exerted improper influence for his fee was paid without question.

[13] It is further said that Mr. Hamilton sought and gained the influence of some of the New York papers. His position was that his client was a common carrier and in a considerable measure aided in the transportation of necessary supplies to the New York market. That New York City was interested in its continuance as a going concern is patent, as is every city in the maintenance of its avenues of trade. These arguments were legitimate and there was nothing improper in their presentation to the public at large. Today before the Interstate Commerce Commission rests the consolidation of the Chesapeake and Ohio Railway Company with certain other railroads. The press is filled with comments on this, favorable and unfavorable. There is nothing improper in laying the facts before the public. On the other hand, it is eminently proper that it should be done. Certainly the law does not denounce it.

[14] In considering evidence excerpts should not be relied upon disassociated from their settings. *Virginia Iron & Coal Co.* v. *Kiser*, 105 Va. 695, 54 S. E. 889.

Mr. Hamilton was a frank witness. In his testimony which covers forty-four pages of the printed record there is no suggestion of evasion. He does state that he used every influence possible in good conscience to gain access to those who had power to pass upon his case and a fair reading of his testimony strongly supports this position. But it must and should be conceded that he makes admissions which, if unexplained, are extremely damaging:

"*Cross Examination.*

"Q. You got all the political backing and any other thing you could get to increase your influence in New York?

"A. I went to Mr. Smith, Mr. R. H. D. Smith, and he helped me with a Mr. Magill who is president of the White Rock Water Company who was very potential in certain quarters in New York and I had to raise the ire of the mayor against Mr. Walker. Mr. H. B. Walker was connected with the Merchants Association of New York and was chairman of their harbor committee. The mayor's re-election was up and one of the things I had to do—I had to point out to Mayor Hylan how in doing this act that I wanted done he was counteracting what his arch enemy, the Merchants Association, in control of Mr. Walker, was doing and I then got Mr. R. D. Smith who knew some of the ramifications and who was connected with the Merchants Association—of course, I am telling tales out of school, but I have to tell them, I suppose—to help me accomplish this end for the

Old Dominion Transportation Company and I went to Mr. Smith. I went on two occasions to his home and he was sick one day when I went there and he told me to come to his house and he outlined to me what he thought was wise for me to do and what I had better do to accomplish the end, and Mr. A. Winslow went with me up on Park Avenue to Mr. R. H. D. Smith's home and we had lunch there and he gave me very potential help in this whole matter and his guidance was very, very helpful.

"Q. Mr. Hamilton, you recognized that you were going up there on a matter that it took a good deal of political pull and backing to make you have a hope of success?

"A. It took everything that I could muster.

"Q. And you were going to get something that an ordinary man going up there wasn't going to get?

"A. That was what Captain Winslow said.

"Q. That is what you believed, wasn't it?

"A. He said he thought I could do it and he had given it up.

"Q. He thought that he couldn't get something that you, with the backing you could get, could get?

"A. There were some other things that convinced him I could do this and I had the friends and acquaintances that might bring it about by hard work.

"Q. Then when you got up there and got all of your political influences at work and got all you could, then that gave you, you say, an entree which enabled you to believe that you were really going to accomplish your purpose in getting pier 26 away from the steamship company and giving it to the Old Dominion Transportation Company?

"A. I did it.

"Q. You know you actually did it?

"A. There are plenty of others who could have done it but if they hadn't done it in the way it was done, they couldn't have done it.

"Q. You had to do it by pulling political strings and getting political influence all the way you could to get the Old Dominion Steamship Company ousted and this company put in place of them?

"A. Mr. Walker was working against me every day and he was doing the same thing that I was doing but I think I got there a little first although it was very remarkable that I did.

"Q. I don't question that at all. Then did they go on and use it after you had accomplished this by pulling political wires and all the personal influence you could bring to bear on the officers of New York? Did the steamship company go ahead and get that pier that they expected to get?

"A. Yes, sir."

That these admissions are capable of the construction suggested is shown by the question of counsel on cross examination at the very time they were made.

"Q. Then when you got up there and got all of your political influences at work and got all you could, then that gave you, you say, an entree which enabled you to believe that you were really going to accomplish your purpose in getting pier 26 away from the steamship company and giving it to the Old Dominion Transportation Company?"

Nor is it probable that the transportation company thought there was anything wrong about this. It paid Mr. McAdoo's fee and it paid Mr. Hamilton on account $2,000.00 and not until presented with a bill for $20,000.00 does it appear to have become alarmed lest public morals be corrupted.

On redirect examination this witness testified as follows:

"Q. Now, Mr. Hamilton, Mr. Venable has asked you a great deal about the political influence and political strings that you pulled. I would like for you to tell the jury whether the political influence which you brought to bear was necessary for the purpose of getting entree to these people in New York?

"A. It was.

"Q. After by reason of this political influence that you had gotten entree and you were up before the mayor and the corporation counsel, did you use any political arguments or did you use arguments with reference to the rights of the Old Dominion Transportation Company and the effect on New York City and Norfolk city?

"A. I never mentioned politics with the mayor. I had gotten to the mayor. I had gotten his ear then and he was with me and I discussed with him on all of the occasions how essential it was for the city of New York to get the food stuffs; that he was dependent on Norfolk as Norfolk was upon him at that time. If he didn't act and make it possible for Norfolk and the new Norfolk owners of these boats to get a place to land he would never get the food stuffs.

"Q. Was a similar argument used with reference to other officials?

"A. All of them."

[15, 16] These answers on cross-examination and the attempt at rehabilitation of the witness on redirect made an issue for the jury and to it under proper instruction this issue should have been submitted. If this were not true a redirect examination would be worse than useless. One charged with crime might, on cross-examination, make statements that could be construed as an admission of guilt. If he were denied an opportunity to explain them that would end his

case. The adequacy of such explanation would be for the jury. Issues raised by more than a scintilla of evidence must be decided in that way. Here it was for it to say whether personal and political influences beyond such as were necessary and lawful were brought to bear when the matter was up for decision. If so, there can be no recovery. On the other hand, if there was nothing corrupt in Hamilton's conduct and if he, when the opportunity finally came, presented his case upon its merits he is entitled to be paid for his services. The decision of this issue settled the case, and on it the jury should have been instructed.

[17, 18, 19] The instruction tendered was too unqualified a statement of the law to be warranted by the evidence. It should have been modified by a statement of the character of the influences personal and political which would vitiate a contract or a recovery upon a *quantum meruit,* and so modified it should have been given. It should have told the jury that the contract in evidence is not against public policy nor illegal on its face, and that the burden of showing it to be against public policy or illegal was upon the defendant unless either of these infirmities appear from the plaintiff's own testimony. When the defendant had shown this by a preponderance of the evidence, the plaintiff could not recover. It should further have told the jury that if it believed from the evidence that either personal or political influences was brought to bear, and that the city authorities were asked to decide the controversy in favor of the transportation company for personal or political reasons, there could be no recovery.

On the other hand, even if the jury believed from the evidence that either personal or political influence

was exerted by the plaintiff, but merely to secure a hearing from the city authorities, and an opportunity to present the matter in issue upon its merits, and that when such opportunity was secured the case was presented upon its merits and upon its merits alone, then in that event the jury should have been told that the plaintiff was entitled to a judgment.

This case is reversed and remanded to be retried in accordance with the views here expressed.

*Reversed and remanded.*

CHRISTIAN, J., concurring:

I concur in results of the majority opinion. But I do not think that the reasoning therein makes it sufficiently clear that the jury may infer from the nature of the contract, and the object to be obtained, that personal and political influence was contemplated and exercised.

Besides, the law therein stated applies to *lobbying contracts*, while this case comes under the rule of law applicable to the use of influence upon officers of the municipality in the discharge of their ordinary business duties.