OLIVER MACHINERY CO. v. GRAND RAPIDS VENEER WORKS.

1. CONTRACTS—PUBLIC POLICY—PUBLIC CONTRACTS.

A secret arrangement under which a person uses his personal influence to secure the awarding of a public contract to another in consideration of undisclosed compensation to be paid to him for his services, if successful, is void as against public policy.

2. SAME—NOT VOID WHERE USE OF CORRUPT INFLUENCE NOT CONTEMPLATED.

A contract to pay for services in assisting to secure a public contract is not void as against public policy where it was not contemplated that any illicit methods or corrupt influences were to be used.

As to effect of contingent character of compensation on validity of contract, see annotation in 39 L. R. A. (N. S.) 747; 46 A. L. R. 203.

Error to Kent; Perkins (Willis B.), J. Submitted October 18, 1929. (Docket No. 93, Calendar No. 34,395.) Decided January 24, 1930.

Assumpsit by Oliver Machinery Company, a Michigan corporation, against Grand Rapids Veneer Works, a Michigan corporation, for services in securing a contract to furnish materials to the State. From a judgment for plaintiff, defendant brings error. Affirmed.

*Corwin, Norcross & Cook,* for plaintiff.

*McAllister & McAllister,* for defendant.

SHARPE, J. In the spring of 1924 the Michigan State Industries sought bids for improvements at the State prison at Marquette. Harry L. Hulbert, then warden of the State prison at Jackson, had the matter in charge. He was well acquainted with Armen S. Kurkjian, the sales manager of the plaintiff company. This company had been the successful bidder on a contract for furniture equipment which had theretofore been installed at the Ionia prison. Some correspondence was had relative to the Marquette work, and, at Hulbert's request, Kurkjian went to Marquette, and on his return he submitted blueprints and aided the warden in preparing the specifications for the needed equipment, among which was a dry kiln. The defendant was a manufacturer of dry kilns at Grand Rapids. Kurkjian, who decided to submit a bid for his company for the entire equipment, went to Grand Rapids and interviewed Mr. Perry, defendant's vice president, about furnishing the kiln. Mr. Perry at that time agreed that ''we will give you 10 per cent. regardless as to

whether we get the order or you get the order.''
Perry sent a man to Marquette, who looked over the
plan of installation and conveniences for delivery,
and on his return wrote Kurkjian at length about it.
As a result of their negotiations Perry wrote a
letter to the plaintiff on June 21, 1924, delivering it
to Kurkjian, in which he said that his company was
putting in a bid on the dry kiln. The letter con-
cluded:

"We have submitted this proposition as you will
see from the attached proposal at $3,995, and it is
understood that the Oliver Machinery Company is
to get 10 per cent. commission on the job regardless
of whether the contract is placed direct with us or
through the Oliver Machinery Company. Your co-
operation is greatly appreciated, and we shall be
glad to have suggestions from you as to what fur-
ther we may do toward helping you close the job.''

The plaintiff also included the price stated in this
letter in its bid, which included much other equip-
ment. Mr. Eddy made several trips to Jackson to see
Warden Hulbert, accompanied by Kurkjian, the pur-
pose of which was to induce the warden to install
the defendant's kiln. While the price was somewhat
higher than other bids for dry kilns, defendant's bid
was accepted. Plaintiff's bid for a considerable
amount of the other equipment, part of which they
were purchasing from other manufacturers, was also
accepted.

On October 10, 1924, the defendant, by Mr. Eddy,
who signed as assistant secretary, wrote plaintiff
that its bid had been accepted, some extras having
been added, amounting to $5,896.60 and added:

"We are passing credit to your account for engi-
neering services rendered on the job to the amount

of $553.34, payment covering this engineering service to be made to the Oliver Machinery Company as remittances are received from the Michigan State Industries.''

Plaintiff acknowledged receipt and inclosed an invoice for ''engineering services in connection with dry kiln proposition for Marquette prison $553.34.'' On November 24, 1924, plaintiff wrote defendant, calling attention to the above invoice, and asked for check for same ''in the very near future.'' Defendant replied on the following day, saying it would remit when it received payment. Plaintiff again wrote on December 20, 1924, asking for payment. Defendant replied on the 23d, saying the invoice had been lost and asking for a duplicate thereof. This was sent on the 29th. On October 24, 1925, plaintiff wrote, saying the kiln had been completed and was in operation, and asking for a check for the amount due it. Defendant answered on the 26th, saying the work had not yet been completed. On May 12, 1926, plaintiff again wrote, urging immediate payment. Defendant replied on the 18th, inclosing statement showing that the kiln had been installed at a loss to it of $9.94, and, on June 19th following, its then manager, E. U. Kettle, wrote plaintiff:

''In reply to your letter of the 17th inst., addressed to Mr. Thwing, regarding your claim against us for commission on the Marquette house of correction dry kiln job:

''We must state positively and finally that we cannot recognize this claim. Neither Mr. Perry nor Mr. Eddy had authority to make any arrangement with you regarding what amounts to nothing more nor less than a secret commission on this job.

''If we could have afforded to cut our price by $442, the State of Michigan should have the benefit

of it. At least, that is the opinion of the undersigned, who is strongly tempted to take this matter up with State officials, as we cannot understand why the State should pay two prices for one service.

"This is straight and to the point, and we hope that you will realize that we don't want to hear any more about it if we can help it."

Soon thereafter plaintiff brought this action to recover the amount of the invoice. Trial was had before the court without a jury. Findings of fact and conclusions of law were filed, resulting in a judgment for plaintiff for the amount claimed and interest thereon. Defendant seeks review by writ of error.

The defense is thus stated:

"Plaintiff's claim under the law is void and against public policy and cannot be enforced."

Warden Hulbert testified that when examining the bids he noticed that the plaintiff had included in its bid the furnishing of a dry kiln manufactured by the defendant, and that defendant had submitted a bid therefor. The price stated in each bid was the same. He called Mr. Kurkjian's attention to it, and asked him "if it made any difference to him about our vapor kiln bid," and that he said, "No, no interest whatsoever. * * * He said he had no interest whatsoever only to give me a complete bid, give me the information I wanted;" that he told him, "we would rather buy direct because we were trying to buy as cheap as possible for the State," and that Kurkjian said, "All right with him;" that he supposed defendant's bid "to be a low down bid," and that his dealings thereafter were direct with it.

It is upon this testimony that defendant's claim is based. We do not construe it as does counsel for the defendant. The price asked for defendant's kiln

in plaintiff's bid was the same as that in defendant's bid. Surely Mr. Hulbert did not assume from what was said that if plaintiff's bid were accepted it would furnish defendant's kiln without profit to itself. He did not assume to state the language used. We think the fair import of what Kurkjian said was that it made no financial difference to his company as to which bid for the kiln was accepted. And it did not. Under its agreement with defendant, the plaintiff would receive the same percentage of profit in either event.

That Kurkjian rendered service by which defendant was benefited in having its bid accepted admits of no doubt. There was nothing unlawful in his efforts to induce Hulbert to accept defendant's kiln as the one most suitable for the service for which it was wanted. Any bidder may do this. No influence was brought to bear upon Hulbert, nor did he have other thought than to secure what the State needed for the lowest price when the merits of the several kilns for which bids were submitted were considered. As he testified:

"We bought what was considered best for the State and at the cheapest price for the bidding thereof."

He knew that Kurkjian and Perry, defendant's representative, had visited him in an effort to secure his selection of defendant's kiln. When he found a bid from both at the same price, he could but have understood that by arrangement between them the plaintiff was to receive a profit on defendant's kiln if its bid was accepted. He testified:

"Certain machinery that is not manufactured by the jobber himself, he charges you a ten per cent. for himself for handling."

We have examined the cases cited and relied upon by defendant's counsel to sustain their claim, but do not find them convincing or controlling. The rule of law seems well established that a secret arrangement under which a person uses his personal influence to secure the awarding of a public contract to another in consideration of undisclosed compensation to be paid to him for his services, if successful, is void as against public policy. This rule is enforced with much strictness in the Federal courts. *Hayward* v. *Nordberg Manfg. Co.*, 29 C. C. A. 438 (85 Fed. 4); *McMullen* v. *Hoffman*, 174 U. S. 639 (19 Sup. Ct. 839). In a note to *Old Dominion Transportation Co.* v. *Hamilton*, 146 Va. 594 (131 S. E. 850), in 46 A. L. R. 186, the authorities are reviewed at length and the following conclusion reached (p. 203):

"The more generally accepted view, and, it is submitted, the correct one, is that a contract of employment in which compensation is contingent upon success in securing contracts, concessions, etc., from the government through its officers, is not on its face void because of the character of the compensation."

*Reinhard* v. *Grand Rapids School Equipment Co.*, 211 Mich. 165, is there referred to. In that case it was held (syllabus):

"An agreement by a corporation to pay its salesmen, one of whom was its officer and sales manager, a commission for procuring government contracts, where it was not contemplated that any illicit methods or any corrupt influences were to be used, *held*, not void as against public policy."

We are in accord with the conclusion reached by the trial court:

"Where a contract of employment as an agent to act for a manufacturer, such as in this case made

and entered into, contemplates no illicit methods or that any corrupt influence is to be used in securing the contract, the same is legal and binding and can be enforced."

The judgment is affirmed.

WIEST, C. J., and BUTZEL, CLARK, POTTER, NORTH, and FEAD, JJ., concurred. McDONALD, J., took no part in this decision.