WRIGHT, Respondent, v. WRIGHT, et al, Respondents.

(237 N. W. 896.)

(File No. 6902.   Opinion filed September 21, 1931.)

*Bruell & Henderson,* of Redfield, for Appellant.

*Corrigan & Walton* and *Van Slyke & Agor,* all of Aberdeen, for Respondent Charlie Wright.

*Sterling, Clark & Grigsby,* of Redfield, for Respondent Minnie Schmidt Wright.

MISER, C.  In May, 1927, respondent Charlie Wright, then a widower, employed as housekeeper his present wife, respondent Minnie Wright, then Mrs. Schmidt, a widow. Within a few months they exchanged mutual promises of marriage.  When, finding herself pregnant by him, she demanded immediate fulfillment of the promise on which he had assured her she might rely in their premarital intercourse, he refused to marry.  On September 29, 1927, she asked advice of appellant D. May Joyce, a practicing lawyer in Aberdeen.  Appellant sent her back to Wright to ask him again to keep his promise.  Wright again refused.  Mrs. Schmidt then employed appellant to secure performance of that promise or damages for its breach.  On September 30th, Mrs. Schmidt delivered her promissory note for $50 to appellant as a retainer and

to apply on expenses. On Saturday, October 1st, Mrs. Schmidt was again at appellant's office and was advised to urge Wright over Saturday and Sunday to fulfill his promise. She did so, but he refused again to marry her and made counter proposals which she rejected.

On Monday, October 3d, Mrs. Schmidt reported Wright's refusal to appellant, who then sent her to a reputable physician for examination as to pregnancy. On the same day, appellant prepared a written contract between Mrs. Schmidt and herself, wherein, after reciting the foregoing facts as to promise of marriage, seduction, pregnancy, breach of promise, Mrs. Schmidt's lack of financial means and appellant's employment as her attorney, the following schedule of fees was agreed upon: If Wright should marry Mrs. Schmidt and not make a property settlement, $1,500; if Wright should marry and make a property settlement of $5,000 —20 per cent. of said amount; $10,000—25 per cent; if over $10,000 to $15,000—$3,500; $20,000 to $50,000—$5,000. Appellant informed Mrs. Schmidt, who was without experience with such contracts, that this contract was reasonable and fair.

After appellant Joyce and Mrs. Schmidt had both signed this contract on October 3d, appellant prepared summons and complaint for breach of promise aggravated by seduction, asking damages against Wright in the sum of $25,000. This complaint was verified by Mrs. Schmidt. Appellant then notified Wright by mail that he might discuss the matter with her at her office between 2 and 4 p. m. on October 4th, otherwise the papers already prepared would be delivered to the sheriff for service. On the morning of October 5th, at her office, appellant handed Wright the summons and complaint. After some discussion with appellant he went home and talked the matter over with Mrs. Schmidt. On the afternoon of October 5th, appellant was told by Mrs. Schmidt that Wright would marry her and deed her the garage property. Later in the same afternoon, at appellant's office, the terms of a property settlement were discussed by appellant, Wright, and Mrs. Schmidt. Appellant then prepared an ante-nuptial agreement, which was signed by both parties.

That agreement recited that they should be married at Ipswich on the following day, October 6; that, because Mrs. Schmidt was pregnant by reason of Wright's intercourse with her under prom-

ise of marriage, Wright was to deed her the garage property; that Wright was to receive the income from that property and therefrom pay taxes and cost of upkeep; that Wright was to suitably provide for the child after its birth and also provide for the support and education of a daughter of Mrs. Schmidt then residing with them; that Wright was to furnish his wife with $30 a month as spending money, and suitably provide for her in his home, she to take care of his home and be faithful to him.

After Wright and Mrs. Schmidt had signed the antenuptial agreement, appellant prepared and, at her request, Wright signed a deed conveying to Mrs. Schmidt the garage property, which the trial court in this action has found to be worth $10,000. Wright then left appellant's office, whereupon appellant prepared and Mrs. Schmidt signed a promissory note to appellant for $2,500 and a mortgage on the garage property securing the same. Appellant then gave back to Mrs. Schmidt the canceled note for $50, heretofore mentioned. The following day, Wright took Mrs. Schmidt to Ipswich, where they were married. On the way to Ipswich, she told him of having given the mortgage of $2,500 on the garage property. Wright protested to appellant at Ipswich that her fee was unreasonable.

On October 10th, four days after the marriage, Charlie Wright began this action against his wife and appellant, Joyce. In his complaint, he alleged that the defendants therein had entered into a conspiracy to defraud him; that he signed the antenuptial agreement because of threats made by appellant to send him to prison; that he was innocent of any sexual acts with Mrs. Schmidt; that he had deeded the garage property worth about $15,000 under threat of prosecution; that he was induced to marry Mrs. Schmidt under duress; that, after discovering the fraud perpetrated upon him by the defendants, he refused to live any longer with Mrs. Schmidt; that he was not the father of Mrs. Schmidt's unborn child; that the deed and the $2,500 mortgage were obtained by fraud. He asked annulment of the marriage, of the antenuptial agreement, of the deed, and of the mortgage, and the vacation of the record of the same.

Both defendants demurred to plaintiff's complaint and moved that plaintiff be compelled to separate his causes of action. These matters were heard on November 10th, plaintiff appearing by

Corrigan & Walton and by Van Slyke & Agor, and defendants appearing by Bruell & Henderson and by McNulty, Williamson & Smith. The demurrers were overruled, and the motions were denied.

On the day of the hearing of these demurrers, Charlie Wright was examined under the statute as an adverse party. On this examination, he testified that he had never asked Mrs. Schmidt to marry him, nor had he ever had intercourse with her, and that the first he learned of Mrs. Schmidt's pregnancy was when he called at appellant's office. Later in this cross-examination he admitted that, about a month before he went to appellant's office, Mrs. Schmidt charged him with responsibility for her pregnancy, which he denied, and "she fetched up the subject every day or two." He testified that he signed the ante-nuptial agreement and deed because he was scared.

Early in February, Charlie Wright returned to his home which he left at the beginning of the action and effected a reconciliation with his wife. Within a few days thereafter he induced Minnie Wright to deed back to him the garage property. On March 20th, Minnie Wright procured, through Sterling, Clark & Grigsby, an order to show cause asking leave to withdraw her original separate answer and to dismiss her former attorneys and to be allowed to serve a separate answer and cross-complaint.

On April 2d, plaintiff Charlie Wright procured an order to show cause why he should not be allowed to file a supplemental complaint setting forth the reconciliation between himself and wife, the reconveyance of the garage property, the mortgage of $2,500 against it, and that said mortgage was obtained through the undue influence and unprofessional advantage taken by defendant Joyce of her client, Minnie Wright, formerly Minnie Schmidt. This application was heard on April 20th. The order granting the application was signed on June 9, 1928. On June 13th, Minnie Wright was granted leave as theretofore prayed, and served and filed her separate answer and cross-complaint. In it she alleged that the note and mortgage were without any valuable consideration and void; that appellant was to receive a fee of $50 if she could induce Wright to marry Mrs. Schmidt; that, if appellant could not persuade Wright to keep his promise of marriage, then she "would institute an action for damages for seduction under

promise of marriage and that if such action was brought on to trial and prosecuted to judgment and said judgment was collected, that she would expect a reasonable attorney's fee dependent upon the amount she was able to recover for this defendant;" that, after appellant had procured Wright's signature to the antenuptial contract and deed, appellant informed Mrs. Schmidt that the property obtained for her was worth $10,000, and that a reasonable attorney's fee would be 25 per cent of that value; that, relying upon the representations of appellant, she executed and delivered said note and mortgage; that a reconciliation had been effected between plaintiff and herself, and that plaintiff was furnishing her with proper care and support; that she had reconveyed said real property to him. She prayed that the note for $2,500 be canceled and the mortgage be canceled and declared void.

At the trial in July, 1928, Wright admitted in contradiction of his former pleadings and his own testimony that he had promised to marry Mrs. Schmidt about two months after she came to work for him; that they had had sexual intercourse; that a child had been born to them in May, 1928. During the trial he abandoned all demands of his complaint except for the cancellation of the note and mortgage.

The court found that the legal services performed by the defendant D. May Joyce for the defendant Minnie Schmidt Wright commenced on September 29, 1927, and ended on October 5, 1927, and that the services so rendered were reasonably worth not to exceed the sum of $700. Judgment was entered ordering the cancellation of the note and delivery to plaintiff of the notes and a satisfaction of the mortgage, but requiring as a condition thereto that $700 be first paid to appellant herein by the plaintiff, Charlie Wright.

Inasmuch as the trial court did not find that the deed of the garage property from Charlie Wright to Minnie Schmidt, later Minnie Wright, was obtained by fraud or duress, and—in view of the nature of the testimony of Charlie Wright—could not have so found, it does not readily appear how he is entitled to have the mortgage thereon canceled. He deeded it, as part of an antenuptial settlement, to Mrs. Schmidt. She mortgaged it to secure the note given by her to appellant, her attorney, for services rendered. The following day Wright, not only was advised of the

mortgage, but of the amount secured by it. Some months later Mrs. Schmidt, then Mrs. Wright, deeded it to him subject to the mortgage. If Mrs. Schmidt acquired the property without fraud or duress, incumbered it; and then transferred it to one who had, not only constructive, but also actual, knowledge of the incumbrance, it does not appear that the transferee is in position to complain. He sold it with his eyes open and bought it back with his eyes open. On the other hand, he should not be required to pay the $700 which the court found to be a reasonable attorney's fee. It was not his debt. His property is subject to an incumbrance of a $2,500 mortgage, but there is no personal liability on him to pay the debt or any part of it. However, if, by foreclosure sale, appellant should collect the mortgage note in full with interest, he cannot complain. He was neither a party to the contract between Mrs. Schmidt and Mrs. Joyce, nor was he a party to the note or mortgage. He is simply the purchaser of mortgage property subject to the mortgage.

On the other hand, the judgment does not require Minnie Wright, who had executed and delivered this note and mortgage, to pay anything. Yet the court found the reasonable value of appellant's services to Minnie Wright to be $700. It may be that a personal judgment against Minnie Wright is valueless except as secured by the lien created by her mortgage. However, it is valuable to that extent. In any event, appellant is entitled to judgment against Minnie Wright. But for what amount?

It should be borne in mind that a contract between attorney and client was entered into on October 3d, and thereafter, on October 5th, a settlement was made between attorney and client. We will first consider the fairness of the contract made. This contract between appellant and her client is no model of clarity, but, giving the client the benefit of every doubt, it stated that, if Wright should marry Mrs. Schmidt and make with her a $10,000 property settlement, Mrs. Schmidt's attorney was to receive $2,500. We are not now concerned with whether that later proved to be unreasonably large pay for the services actually rendered. The question is, Was it unreasonable when the contract was made? Some of the many circumstances to be considered in determining an attorney's compensation are: The nature and importance of the business in which the services were rendered; the labor, time, and

trouble involved; the results secured; the burden carried by the attorney; his fitness for the particular task; the weight of responsibility imposed; the contingent nature of the fee. 6 C. J. 750; Old Dominion Transportation Co. v. Hamilton, 146 Va. 594, 131 S. E. 850, 851, 852, 46 A. L. R. 186; Dent v. Foy, 214 Ala. 243, 107 So. 210, 216; In re Moore's Estate, 118 Neb. 568, 225 N. W. 705; Bayou, et., Dist. v. Chapline, 143 Ark. 446, 220 S. W. 807, 810.

■ On October 3d, when the contract was made between the attorney and client, every reasonable effort to secure her client's rights had failed. The nature of the business was such as to subject an attorney to the danger of being placed, as appellant later was placed, between the upper and the nether millstone. That this was appreciated by the attorney was manifested by her requirement that her client submit to medical examination to determine her pregnancy. The importance of the business has already been sufficiently shown. As to the labor, time, and trouble expected to be involved, it could not reasonably be anticipated that Charlie Wright, who had theretofore refused to keep his promise to the woman who became pregnant by him, and who thereafter did not scruple to charge her with conspiracy to defraud, and who denied, both in his pleadings and when examined as an adverse witness, that he had ever had intercourse with Minnie Schmidt, would, on October 5th, make a fair settlement with Minnie Schmidt and, on the day following, marry her. Moreover, while there was a possibility that Charlie Wright would settle, as he did, on October 5th and marry, as he did, on October 6th, there was also the possibility, which became an actuality, that Charlie Wright would attempt to repudiate the settlement and the marriage and cause appellant to defend, not only her client, but herself, against a charge of conspiracy to defraud. As to the burden carried by appellant in this matter, nothing needs be added to what has already been stated. As to her fitness for the particular task, whatever handicaps may confront the woman lawyer, this was a task for which her sex was an asset. As to the contingent nature of the fee, while the contract did not expressly provide that no fee should be payable except upon the contingency of success, it was apparent that, unless her client was successful, she would obtain no fee. Therefore it was not unreasonable, as the circumstances appeared on October 3d, when the contract was entered into between attorney and client,

that the contract should provide for a fee of $2,500 if the parties should marry and her client obtain a property settlement of $10,-000. Under section 2600, Rev. Code 1919, the compensation of attorneys must be left to the agreement of the parties. In Egan v. Burnright, 34 S. D. 473, 149 N. W. 176, Ann. Cas. 1917A, 539, this court held that attorneys may not take advantage of a client's confidence in them to charge unreasonable fees, but as the situation appeared on October 3d, when the agreement was made, the fees contracted for were not unreasonable.

The contract for attorney's fees having been fair when entered into, may the court reduce the settlement thereafter made? The trial court found that appellant's legal services begun September 29th and ended on October 5th were reasonably worth not to exceed $700. Despite the fact that appellant settled or rather, on October 5th, had apparently settled the matter by obtaining for her client the title to a $10,000 property, an allowance of $30 per month, the support of a minor daughter, the legitimacy of an unborn child, and the status of a lawful wife, $700 might have been a sufficient fee for the services rendered had there been no previous contract for fees, had appellant actually been paid $700 and been relieved of all responsibility to her client.

But appellant neither received $700 in money on October 5th nor was she freed of responsibility to her client. Five days later her client was made defendant in a suit in which client and attorney were charged with conspiracy to defraud Charlie Wright, the marriage was sought to be annulled, the antenuptial agreement was sought to be canceled, the deed to Minnie Schmidt and the mortgage by Minnie Schmidt to appellant were sought to be set aside. Furthermore, in that suit appellant herself was charged with fraud, her professional integrity was assailed, and later she had to defend herself against the combined assaults of the Wrights. We are of the opinion that in fixing the fee at $700 the learned trial judge did not give sufficient consideration to the pre-existing contingent contract nor to the continuing burden and responsibility.

On the other hand the attorney's fees contract, entered into on October 3d, did not provide for a mortgage to secure the fee and— what is more important—it is not certain that the interest actually acquired by Minnie Schmidt in the garage property was worth $10,000. However, other rights and concessions obtained would,

in a measure, offset the diminution, if any, of the value of the interest in the garage property which appellant's client acquired.

The trial court found that the original contract for fees, made on October 3d, was unreasonable, and that the reasonable value of appellant's services was $700. We are unable to agree with either of these findings. Under all the circumstances the agreement made on October 3d was not unreasonable, nor, in the light of the testimony given by attorneys called as experts on value of legal services, particularly in view of the fact that there was a lawful contract for a much greater contingent fee, was $700 a reasonable allowance. If there was any necessity therefor, it was proper for the trial court to determine the amount of a reasonable fee. Egan v. Burnight, 34 S. D. 473, 478, 149 N. W. 176, 178, Ann. Cas. 1917A, 539. This court, as well as the trial court, may be considered experts upon the value of legal services. McDougal v. Black, etc., Co. (C. C. A.) 277 F. 701, 707; 6 C. J. 763, note 24; Tracy v. Spitzer-Rorick Trust & Savings Bank (C. C. A.) 12 F. (2d) 755; Kirk v. Culley, 202 Cal. 501, 261 P. 994. But is it necessary to determine a reasonable fee in this case? If the property settlement made by Charlie Wright with Minnie Schmidt enriched the latter to the extent of $10,000, then there is no occasion for determining the amount of a reasonable fee, for the attorney fee was fixed by the contract. As heretofore stated, Charlie Wright is not entitled to have either the trial court nor this court determine the amount of appellant's fee. If Minnie Schmidt Wright is relieved from the payment of a deficiency judgment after the foreclosure of the mortgage securing her note for $2,500, she may not complain. Assuming then, though not deciding, that the amount of the recovery in the property settlement was not such as to entitle appellant, under her contract, to an attorney fee of $2,500, no reason is apparent for requiring a retrial when, by providing that Mrs. Wright shall not be liable for a deficiency judgment, her interests are fully protected.

The judgment should therefore be reversed, and the cause remanded, with instructions to enter judgment in harmony herewith.

POLLEY, P. J., and ROBERTS, WARREN, and RUDOLPH, JJ., concur.

CAMPBELL, J., disqualified and not sitting.